671 So.2d 1081 (1996)
Thomas M. OLIVER, Sr. Plaintiff/Defendant-in-Rule/Appellee,
v.
Regina P. OLIVER, Defendant/Plaintiff-in-Rule/Appellant.
No. 95-1026.
Court of Appeal of Louisiana, Third Circuit.
March 27, 1996.
*1084 Nathan A. Connie, Lake Charles, for Thomas M. Oliver Sr.
James Edward Hopkins, Sulphur, for Regina P. Oliver.
Before PETERS, AMY, and SULLIVAN, JJ.
SULLIVAN, Judge.
This suit concerns the custody of Thomas Oliver, Jr. (Thomas), the now seventeen-year-old child of defendant/plaintiff-in-rule/appellant, Regina Oliver (Regina), and plaintiff/defendant-in-rule/appellee, Thomas Oliver, Sr. (Tommy). The trial court denied Regina's demand for a change from joint custody, as mandated by a 1985 court decree requiring the yearly alternation of domiciliary custody, to the designation of Regina as the sole domiciliary parent. In rejecting Regina's demand, the trial court ordered that the 1985 custody decree would remain in effect. The trial judge concluded that, despite numerous changes in circumstances which have materially affected Thomas' welfare, the continuation of the existing arrangement would not be so deleterious to Thomas to justify a modification. He further determined that, despite the fact that the parties often disagree, the arrangement has worked well for nearly ten years in Thomas' best interest.
Regina appeals, asserting that the trial judge erred in:
(1) applying the "heavy burden" rule enunciated in Bergeron v. Bergeron, 492 So.2d 1193 (La.1986) to the facts of this case;
(2) finding that the existing custody arrangement is not deleterious to Thomas;
(3) finding that the existing custody arrangement has worked well;
(4) placing undue emphasis on Thomas' preference;
(5) relying on the testimony of Dr. Brenda Roberts, Ph.D., the father's expert when her opinion was internally inconsistent, contrary to the facts, and based on an insufficient foundation; and,
(6) basing his opinion on alleged facts found only in Tommy's post-trial brief which is not of record.
After thoroughly reviewing the record in its entirety, we conclude that the trial court did not err in denying the custody modification sought by Regina. Accordingly, for the following reasons, we affirm.

*1085 FACTS
Regina and Tommy were married on December 15, 1977. One child, Thomas, was born on January 4, 1979. Thomas was born with a mild case of Lowe's Syndrome, a rare disorder which primarily affects the kidneys, eyes, and growth potential of persons with the disorder. Severe mental retardation is also a characteristic of Lowe's Syndrome, but Thomas is only mildly mentally retarded. In 1983, the parties physically separated. They were divorced by judgment rendered on July 6, 1984, and signed on October 31, 1984.
On February 15, 1985, the trial court held a contradictory hearing on the issue of custody. Thereafter, the court ordered the joint custody of Thomas, who was then six years old, on an alternating one-year basis. In other words, each party had primary domiciliary parent status for one year, subject to regular visitation with the non-domiciliary parent during that year. The parents' status switched every July 15.
At the time of the original decree, little was known about Lowe's Syndrome. The conventional wisdom was that Thomas would not be capable of attending school and that his life expectancy was five to ten years. This custody decree, which is not in the record, was signed by the trial judge on August 6, 1985. Regina filed a motion for new trial on August 13, 1985. The trial court set a hearing on this motion for September 11, 1985. On joint motion of the parties, the hearing was indefinitely continued. Neither the record nor the minutes indicate that the trial court ever conducted this hearing.
After the divorce, Regina attended McNeese State University in Lake Charles and obtained a bachelor's degree in commercial art. In 1987, she moved from Lake Charles to Beaumont, Texas. In 1988, Regina moved to Nederland, Texas, and has been living there since. On February 12, 1988, Tommy married Paula Connor. He works as a high school vocational agriculture teacher. They have had four children since getting married.
On March 30, 1993, Tommy filed a petition to fix responsibility for Thomas' medical expenses. On May 25, 1993, Regina filed an answer and reconventional demand seeking sole custody of Thomas. Therein, she alleged a change in circumstances and that Thomas' best interest would be served with herself as his sole custodial parent. Tommy opposed Regina's reconventional demand and likewise requested to be designated as Thomas' sole custodial parent.
The trial court conducted a hearing on the matter on April 18, 1994. At the hearing, Tommy abandoned his action for sole custody of Thomas. He maintained that the existing custody decree should remain in force.
At the hearing, Regina testified that Lowe's Syndrome affects primarily the eyes, brain, and kidneys. Children afflicted with the disorder have heightened levels of stubbornness and moodiness; they also tend to experience temper tantrums more often than typical children. She explained that she wants sole custody of Thomas because she can give him more individual attention than he can receive at his father's home. She has lived in Nederland for six years and has no plans to move or marry. Regina stated that she and Thomas live in a good neighborhood and that his friends' homes are within walking distance from their home. He has several friends and participates in a church youth group, Sun Seekers. Thomas has his own room. When he resides in Nederland, he attends Nederland High School where he is enrolled in a curriculum geared toward independent living and vocational skills. Regina emphasized that she thinks this curriculum is better for Thomas than the more academic-oriented curriculum favored by his father. She expressed concern with Thomas' lack of educational continuity which is caused by having to switch schools and change curricula each year. Additionally, she said that it is stressful to Thomas to have to begin anew each year insofar as friendships are concerned.
Regina testified that she is self-employed. At the time of trial, she was working from her home as a commercial artist. She stated that she had recently purchased a computer and was concentrating on learning how to ply her trade on the computer. Regina said that, because she is devoting most of her *1086 time to this training, she has not been able to earn a substantial income. She was receiving $1,000 per month in financial support from her parents.
Regina stated that she and Tommy disagree primarily on the structure of Thomas' home life and educational direction, methods of discipline, medical decisions, and whether he should be taught pre-Braille. The misunderstandings and disagreements have been a constant occurrence during the eight and one-half years preceding the hearing. The disagreements, through the years, have been mainly "little trivial things" that have gotten blown out of proportion. She related that, although she and Tommy are required to make medical decisions in consultation with each other, she was not informed of Thomas' March 1994 eye surgery until the day after it occurred. She characterized Tommy as "stubborn" and said that he does not communicate well with her concerning Thomas.
Regina also said that, practically every year that Thomas has returned to his father's home, Tommy and Paula have a new child. This concerned her because she feels that, at his father's home, Thomas is progressively lacking the one-to-one attention that he needs and gets when he is with her. According to Regina, Thomas expressed a preference in wanting to continue the alternating one-year custody arrangement because he did not want to hurt either parent by making a choice. She said that Thomas told his counselor, Dr. Brenda Roberts, that if he had to make a choice, he would choose to live with his mother in Nederland.
Several witnesses testified on behalf of Regina. Ida Poe, Regina's mother, was qualified as an expert in special education. She stated that Thomas needs continuity in his educational program; in her opinion, he is not where he should be academically because of the difficulty he experiences in having to start over each year in a new environment. According to Mrs. Poe, her daughter chose to move to Nederland primarily because of the quality of the school. She explained that she and her husband are financially supporting Regina and Thomas, and if Thomas would experience serious health problems, they would help Regina as much as possible. According to Mrs. Poe, Thomas expressed to her that he would rather live with his mother in Nederland. This testimony concerning Thomas' expressed preference was corroborated by the testimony of Joe Poe, Regina's father.
Mandy Spitler, Regina's friend, stated that she lives near Regina in Nederland. She said that Regina and Thomas have a "real loving relationship" and that Regina is a good mother who cares for and encourages Thomas. Mrs. Spitler explained that Regina disciplines Thomas with a firm tone of voice and that she has never observed Thomas being a discipline problem. She related that, on January 24, 1993, she witnessed bruises on Thomas' arm which he told Regina were caused by his stepmother pinching him in an attempt to get him to kneel.
Three members of Regina's church congregation testified that they have observed the relationship between Regina and Thomas. These witnesses uniformly stated that Regina and Thomas are very active in the church and that they interact very well together. Thomas gets along well with the other children in the church youth group, and the children are accepting of him.
Regina's sister, Vicky Boudreaux, and her aunt, Louise Quigley, also testified. Mrs. Boudreaux said that Thomas enjoys taking part in family activities with the extended Poe family. She explained that Regina lets Thomas do as much as he independently can accomplish. Mrs. Quigley stated that, based on her observations, Regina is a very good, loving, and caring mother to Thomas.
Tommy testified that he has a Bachelor of Science degree from the University of Southwestern Louisiana in vocational agricultural education. At the time of trial, he was teaching at Hyatt High School. Although he had resigned his position effective at the end of the 1994 school year, Tommy had applied for a similar position at Starks High School. Since Thomas has been in school, Tommy has worked successively at Fairview High School, Iowa High School, Paw Paw's Restaurant, Iowa High School, and Hyatt High School. He also stated that, if necessary, he would return to Paw Paw's Restaurant as a night *1087 manager, a position he held for four years in the late 1980s and early 1990s.
At the time of the hearing, Thomas was living with his father and stepmother. Tommy testified that, although Thomas' condition is stabilized, he has to see a nephrologist once every four to six months and an eye specialist once a year. These specialists are in New Orleans. Thomas also is examined by a local ophthalmologist once every three to four months to check for glaucoma.
Tommy stated that Paula and he provide a loving family environment for Thomas, who has his own room in their home. He felt it important that Thomas have a male role model at this stage of his development. He denied having any extraordinary disciplinary problems with Thomas. In their household, he is treated like a normal child and is disciplined just as the other children. Tommy characterized Thomas' behavior as being typical of all children. He contrasted their approach to that of Regina, whom he said "babies" Thomas and gives in to him too much.
According to Tommy, Thomas enjoys going to school in Singer. He and Thomas regularly take part in Future Farmers of America (FFA) activities. Thomas has the responsibility of raising his own animals for showing at FFA competitions. Tommy stated that his son enjoys caring for the animals and participating in the FFA events. Thomas also likes to do things on his own; this gives him a fuller sense of accomplishment.
Tommy further testified that he concurs in Thomas' wishes to leave the yearly alternating custody arrangement intact. He acknowledged that he and Regina have had disagreements on the implementation of the joint custody decree. They also have differences of opinion on several issues, including educational direction and medical care. Tommy said that he favors a vocation-oriented academic curriculum because every educational evaluation of Thomas has resulted in this curriculum being recommended. Tommy explained that he wanted Thomas to learn Braille based on a Louisiana School for the Blind evaluation which recommended that, as he grows older, Thomas should be given the opportunity to learn Braille. He also read an article in a blind association periodical which convinced him that Thomas should learn Braille in case his vision should further deteriorate.
Additionally, Tommy stated that he could not understand why, after Thomas had been treated all his life by medical specialists in New Orleans, Regina tried to get his primary care switched to medical specialists in Houston. Tommy explained that Thomas had also been treated on two occasions by a Dr. Charnas, a Lowe's Syndrome expert with the National Institutes of Health in Bethesda, Maryland. When Tommy wished to have Thomas evaluated there for possible inclusion in an experimental behavior modification drug study, Regina objected due to the potential side effects. Tommy deferred to Regina's wishes in this matter. As to the March 1994 eye surgery, Tommy stated that Regina knew in November 1994 that this surgery was necessary to prevent permanent damage. Paula and he were afraid that, if they told Regina of the surgery beforehand, she would disagree with their decision and not allow the necessary procedure to go forward.
Paula testified that she loves Thomas very much and would do anything for him. She described the present custody situation as good because Thomas gets to be with his mother and also gets to have a "full family" at their home with brothers and a sister. She said that Thomas is happy with the joint custody situation and that he wants it to remain in place.
Dr. Brenda Roberts testified on behalf of Tommy. She stated that Thomas was originally counseled by Dr. Charles Downing, but, when Dr. Downing became ill, she took over the counseling of Thomas. According to Dr. Roberts, Dr. Downing had expressed to her that he was surprised that the alternating custody had worked well. She first met with Thomas on July 29, 1993, to assess his behavioral and social interaction at home. She counseled him on nine separate occasions between this date and April 6, 1994. Dr. Roberts described Thomas as being borderline mentally retarded; he has difficulty expressing his feelings, handling changes, and *1088 sharing. There are problems with his behavior in his father's household because of the necessity for sharing with other siblings. However, Dr. Roberts stated that the home environment could provide positive training for Thomas by teaching him the importance of sharing.
Dr. Roberts characterized Thomas as being used to and comfortable with the yearly alternating custody arrangement. She explained that, as a Lowe's Syndrome child who is reluctant to experience changes, Thomas had become accustomed to this routine and does not want it altered. Dr. Roberts felt that Thomas' wishes should be respected. In any event, she said that Thomas did not want to have to make the decision. Dr. Roberts opined that the alternating custody decree should remain in force.
On cross examination, Dr. Roberts acknowledged that having to move ten times in ten years has not been good for Thomas. However, she urged that, although the yearly change has had some effect on Thomas, the effect has not been adverse to his best interest. In a short period of time after moving, he adjusts well to his new environment. She also conceded that Thomas needs individual interaction with his parents, which is more difficult for him to receive in his father's home. However, she noted her opinion that Thomas does feel more socially accepted in Singer than in Nederland.
Several other witnesses testified on behalf of Tommy. Jeanette Coble, a teacher's aide at Welsh Elementary in Welsh, Louisiana, stated that she taught Thomas for three alternating years. She had last taught Thomas in 1990. According to Mrs. Coble, Thomas had no trouble adjusting on returning to the school after being away for a year. She recalled him to be a happy boy who is well accepted by the other children. He was never unruly or uncontrollable in school and posed no discipline problem. During Thomas' first year at Welsh Elementary, his father would come to school practically every day to check on Thomas. Tommy participated greatly in the educational development of his son. Mrs. Coble explained that his father pushed Thomas to achieve but not to the point of frustrating him. According to Mrs. Coble, Tommy has a reputation as a caring and concerned parent.
Karen Buxton, a teacher at Hyatt High School, testified that Tommy teaches her daughter vocational agriculture. She has observed Thomas and his father interact in what she described as a "normal father-son" relationship. Ms. Buxton stated that she had never noticed Thomas being a discipline problem and that the Oliver household is appropriate for child rearing.
Marjorie Cooley, a Singer resident, stated that, in her opinion, Tommy is a good father to Thomas. She observed that all of the children involved in the FFA program like Thomas, who appears happy and especially proud of his vocational agriculture accomplishments. Ms. Cooley stated that Thomas is a "delightful boy" who gets along well with his brothers and sister. According to Ms. Cooley, Thomas does take part in a great deal of activities with his father. She stated that people in the community enjoy Thomas' company.
Beatrice Oliver, Tommy's mother, testified that Thomas and his father get along fine. Tommy's father, Claude Oliver, stated that Thomas and his father have a good relationship and that Thomas' home life with his father appears to go well.
Marjorie Connor, Paula's mother, testified that Thomas, his father, and his stepmother relate well to one another. Thomas has never shown displeasure about being at their home.
Alicia Mitchell and Terrell Vincent, Tommy's former students, testified that he is a good father. According to these witnesses, Thomas and his father get along well. They never witnessed Thomas being uncontrollable when he was with his father and/or stepmother.
Thomas, the subject of this dispute, testified before the trial judge and the parties' counsel in the jury room. He stated that he likes living in Singer. There, he has his own room and enjoys fishing in the pond and showing his animals at FFA competitions. He said that he also likes living in Nederland. There, he also has his own room, can walk to his friends' homes, and enjoys participating *1089 in the Sun Seekers church youth group. He also likes the school in Nederland. In response to a question concerning his preference on the proposed change of custody, Thomas expressed his desire to "leave it like it is." He stated that he does not want to have to choose between his mother and his father. He would rather someone else decide what is best for him. He did, however, recall telling Dr. Roberts that, if he were forced to choose where to live, he would pick Nederland. He could not recall telling this to his mother or other members of her family. He reiterated though that, as of the date of trial, he desired that the alternating custody arrangement remain unchanged.

LAW AND OPINION
Regina assigns nine errors to the judgment of the trial court. The initial four errors deal primarily with the propriety of the application of Bergeron, 492 So.2d 1193, to this case. For purposes of this opinion, we have combined these errors relating to the application of the Bergeron "heavy burden" rule into a single discussion.

The Applicability of Bergeron
La.Civ.Code art. 131 requires that "[i]n a proceeding for divorce or thereafter, the court shall award custody of a child in accordance with the best interest of the child." In Bergeron, 492 So.2d 1193, the Supreme Court of Louisiana first enunciated the rule that a heightened burden of proof applies to the modification of a "considered" decree of custody. The court stated:
[I]n order to protect children from the detrimental effects of too liberal standards in custody change cases, the burden of proof should be heavy and the showing of overall or net benefit to the child must be clear. To accommodate these interests, the burden of proof rule should be restated as follows: When a trial court has made a considered decree of permanent custody the party seeking a change bears a heavy burden of proving that the continuation of the present custody is so deleterious to the child as to justify a modification of the custody decree, or of proving by clear and convincing evidence that the harm likely to be caused by a change of environment is substantially outweighed by its advantages to the child.
Id. at 1200.
A considered decree is one which results from the reception by the court of evidence concerning parental fitness to exercise custody. Norris v. Norris, 604 So.2d 107 (La.App. 2 Cir.1992). Every child custody case must be decided solely on its own particular facts and circumstances. Beard v. Beard, 599 So.2d 486 (La.App. 3 Cir.1992). "In child custody cases, the decision of the trial court is to be given great weight and overturned only where there is a clear abuse of discretion." Thompson v. Thompson, 532 So.2d 101 (La.1988).
First, Regina asserts that the application of the Bergeron rule to this case was error as a matter of law because the original custody decree had never become final. She contends that her still-pending motion for new trial interdicts the finality of the custody decree because the trial court never ruled on the merits of the motion. Tommy counters that, because more than five years have passed since Regina filed her motion for new trial, the action was abandoned by the operation of La.Code Civ.P. art. 561. He also asserts that Regina's compliance with the custody decree and her filing, on one occasion, of a motion for compliance therewith should estop her from being able to urge the nonfinality of the custody decree.
The record indicates that Regina's motion for new trial was timely filed on August 13, 1985, six days after the trial court signed the original custody decree. The trial court set a hearing on the motion for September 11, 1985; the hearing was continued indefinitely on a joint motion of the parties. Apparently, the hearing was never held.
La.Code Civ.P. art. 561(A) provides, in pertinent part, that "[a]n action is abandoned when the parties fail to take any step in its prosecution or defense in the trial court for a period of five years." The phrase "step in its prosecution" requires a party to take some formal action before the court which is intended to hasten the suit to judgment. Department of Transportation and Development v. Waste Management, Inc., *1090 626 So.2d 59 (La.App. 3 Cir.1993); DeClouet v. Kansas City Southern Railway. Co., 176 So.2d 471 (La.App. 3 Cir.), writ refused, 248 La. 383, 178 So.2d 662 (1965). The last formal action taken by Regina was the August 1985 joint motion to continue, which resulted in the indefinite continuation of the hearing on her motion. This action, however, cannot be considered a step in the prosecution since, by its very nature, a motion for continuance is not intended to hasten the matter to judgment. Therefore, the last action taken in prosecution of this matter was the filing of the motion for new trial. For five years thereafter, Regina failed to take any step in the prosecution of her motion for new trial. By operation of law, the motion for new trial was abandoned. Because we have determined that Regina's motion was abandoned, we pretermit any discussion on the issue of whether she should be estopped from asserting the nonfinality of the original custody decree.
Second, Regina contends that the trial court's application of the Bergeron rule was legal error because no plan of implementation was enacted in conjunction with the original custody decree. In 1985 at the time of the custody hearing, La.Civ.Code art. 146(A)(1) [repealed by Act No. 261 of 1993; subparagraph redesignated as La.R.S. 9:335] required that, in cases of joint custody, the parents were to submit a plan for implementation of the custody order unless the trial court waived the requirement for good cause. Russell v. Russell, 589 So.2d 3 (La.App. 5 Cir.1991). The purpose of this requirement was to aid the trial court in determining the "parties' ability and desire to cooperate and to study the particulars of the plan to insure that the best interest of the child is served." Hull v. Hull, 499 So.2d 1037, 1039 (La.App. 3 Cir.1986). Failure to require a plan of implementation has been held to constitute reversible error. Yamayans v. Yamayans, 490 So.2d 371 (La.App. 1 Cir.1986).
The trial court minutes indicate that, on February 15, 1985, a trial on custody was held at which testimony and evidence were adduced. The minutes further reflect the notation, "[c]ustody plan to be submitted...." The record contains no transcript of this custody hearing and no written plan of implementation submitted by either party.
It is difficult to determine if the trial court failed to comply with this codal requirement. The minutes indicate that the trial judge ordered the submission of plans of implementation and that the parties did not comply with this order. Even if the trial court failed to order the submission of a plan, this omission is of no moment in the present appeal. Regina could have urged this omission as a defect or error in the original custody decree, but she did not appeal that decree or urge the trial court's omission as a basis for new trial. The time delays for taking an appeal from the original custody decree have long since run. Therefore, the fact that, in 1985, the trial court may have failed to require the parties to submit a plan of implementation has no bearing on whether the custody decree is now final for purposes of the application of the Bergeron rule.
Third, Regina contends that the trial court erred as a matter of law by applying only one prong of the two-prong Bergeron "heavy burden" rule. Specifically, she claims that the trial court only applied the "[proof] that the continuation of the present custody is so deleterious to the child as to justify a modification of the custody decree" prong and not the "[proof] by clear and convincing evidence that the harm likely to be caused by a change of environment is substantially outweighed by its advantages to the child" prong. Bergeron, 492 So.2d at 1200. Regina urges that the trial court was obligated to apply both prongs of the Bergeron rule.
In well-written reasons for judgment, the trial court acknowledged that the Bergeron "heavy burden" rule was applicable to the case. He then quoted the rule in its entirety. He then, for reasons assigned, concluded that "the continuation of the present custody arrangement is not so deleterious to Thomas Oliver as to justify modification of the custody decree." The trial court's judgment reflects that, pursuant to the Bergeron doctrine, Regina's "plea for change of custody... is ... denied and the present custody arrangement ... shall continue" because such continuation is not so deleterious to justify modification.
*1091 The two separate prongs of the Bergeron "heavy burden" rule are separated by the disjunctive conjunction "or," meaning that the proponent of the change must prove either the first prong or the second prong. However, the rule does not require the trial court to specifically state in judgment or reasons therefor that the proponent of the change failed to carry her burden of proof on both prongs. When a judgment is silent on a demand at issue in the case under the pleadings, such silence is considered an absolute rejection of the demand. Dowden v. Mid State Sand & Gravel Co. Inc., 95-231 (La. App. 3 Cir. 11/2/95); 664 So.2d 643, writ denied, 95-2864 (La. 2/2/96); 666 So.2d 1099; Hendricks v. Hendricks, 594 So.2d 1129 (La. App. 3 Cir.1992). The trial judge's inclusion of the Bergeron citation in both the reasons for judgment (in which the entire rule itself was quoted) and the judgment indicate that he sufficiently considered the totality of the "heavy burden" rule enunciated in Bergeron. The trial court's failure to specifically and explicitly reject Regina's cause of action based on the second prong of the Bergeron rule was not error.
Fourth, Regina contends that the trial court erred as a matter of law in applying the Bergeron rule to perpetuate an inherently unstable custody arrangement. She argues that the harm the Bergeron rule seeks to avoid, the disorienting and confusing change of home environments, was preserved by the blind application of the Bergeron rule to this case.
The sole criterion for determining if the Bergeron rule is applicable to a particular case is whether the custody decree sought to be modified is a considered decree. If so, then the Bergeron rule, which is a jurisprudential rule of evidence, applies. If not, then the proponent for modification has a lesser burden of showing "a material change in circumstances since the entry of the original decree and that the modification proposed is in the best interest of the child." Beard, 599 So.2d at 488. In the present case, the record establishes that the custody decree at issue was a considered decree since the trial court held a contradictory hearing, at which testimony and evidence were adduced, before issuing the custody decree. As such, the trial court correctly applied the Bergeron rule to Regina's demand for change in custody without regard to the substance of the existing custody decree.
Finding a Lack of Detriment in the Continuation of the Existing Decree and that the Existing Decree Works Well
Regina contends that the trial court manifestly erred in finding that the continuation of the existing yearly alternating custody arrangement is not deleterious to Thomas. She asserts that such alternating custody arrangements have historically been looked upon with disfavor by our courts. This arrangement, she argues, should be discontinued in favor of sole custody to her.
In DeSoto v. DeSoto, 94-1048, p. 2 (La.App. 3 Cir. 3/1/95); 651 So.2d 497, 498, this court explained the standard of review in such cases as follows:
Whether plaintiff has met the burden of proving that the continuation of the present custody is so deleterious to the child as to justify a modification of the custody decree, or of proving by clear and convincing evidence that the harm likely to be caused by a change of environment is substantially outweighed by its advantages to the child, is a question of fact which will not be disturbed absent manifest error.
Therefore, in order to reverse a factfinder's determination, this court must (1) find from the record that a reasonable factual basis does not exist for the trial court's finding and (2) determine that the record establishes that the finding is clearly wrong (manifestly erroneous). Stobart v. State, Department of Transportation and Development, 617 So.2d 880 (La.1993). We are bound to review the record in its entirety and resolve the issue of "not whether the trier of fact was right or wrong, but whether the factfinder's conclusion was a reasonable one." Id. at 882. If the factfinder is faced with choosing between two permissible and conflicting views of the evidence, his decision, especially when based on reasonable evaluations of credibility and reasonable inferences drawn from the evidence, should not be reversed unless it is *1092 clearly wrong. Rosell v. ESCO, 549 So.2d 840 (La.1989).
Regina argues that the existing custody arrangement causes adjustment problems for Thomas and promotes hostility between the parents. This is her version of the evidence. The trial court had to choose between this version of the facts and the opposite version, i.e., facts which tended to prove that, despite some difficulty in implementation and mutual decision making, the existing custody arrangement works well and is not so deleterious as to require modification. Both views of the evidence were reasonable and amply supported by positive evidence which conflicted. Although Regina is correct when she argues that such alternating custody arrangements for school-age children with parents residing in separate locales are not favored by the courts, see Stanley v. Stanley, 592 So.2d 862 (La.App. 3 Cir.1991), the trial court determined that in this unique circumstance the arrangement worked well and to the benefit of Thomas. After thoroughly reviewing the record, we cannot say that the trial judge's factual determinations were manifestly erroneous or clearly wrong.

Placing Undue Emphasis on Thomas' Preference
Regina next contends that, in making his decision, the trial judge placed an inordinate amount of emphasis on Thomas' preference to maintain the existing custody arrangement. It is well settled that the child's preference, although not dispositive or controlling, is a relevant factor which the trial court may take into consideration in determining custody. Sheppard v. Hood, 605 So.2d 708 (La.App. 2 Cir.1992); Morgan v. Huddlestone, 430 So.2d 304 (La.App. 3 Cir.), writ denied, 434 So.2d 1094 (La.1983). Our review of the trial judge's reasons for judgment reveals that he followed the dictates of this policy. The trial judge considered Thomas' preference and weighed it along with numerous other relevant factors in determining whether or not to modify the custody decree. In this regard, the trial court did not place an undue amount of emphasis on Thomas' preference.

Relying on the Opinion of Dr. Brenda Roberts, Ph.D.
Regina next contends that the trial court erred in relying on the testimony of Dr. Roberts, Thomas' mental health counselor. Regina asserts that Dr. Roberts' opinions were based mainly upon impressions she formed as a result of phone conversations she had with Thomas' prior counselor, Dr. Downing, who is now deceased. She also complains that Dr. Roberts' opinions were based on an insufficient foundation, internally inconsistent, and contrary to the facts.
La.Code Evid. art. 702 provides:
If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise.
In Durkee v. City of Shreveport, 587 So.2d 722, 728 (La.App. 2 Cir.), writ denied, 590 So.2d 68 (La.1991) the second circuit reasoned as follows:
The weight to be accorded to the testimony of experts depends largely on their qualifications and the facts on which they base their opinions. The trial court may evaluate expert testimony by the same principles as apply to other witnesses; it has great discretion to accept or reject medical or lay opinion.
[Citations omitted.]
The substance of Dr. Roberts' testimony reveals that she counseled Thomas on nine occasions from July 29, 1993, through April 6, 1994. She also conferred once with his former therapist, Dr. Downing, on the phone before her initial session with Thomas. Her testimony was clearly based upon the knowledge obtained from her counseling sessions and the background information derived from Dr. Downing. Although Dr. Roberts was testifying on behalf of Tommy, she readily acknowledged points of fact that were in favor of Regina. For instance, Dr. Roberts conceded that Thomas needs individual parental attention, which is difficult for him to receive at his father's home. She also admitted that it is possible that Thomas really *1093 wants to live with his mother in Nederland, but he is refusing to express this preference because he does not want to hurt his father. After testifying as to factors which favored both Tommy and Regina, Dr. Roberts gave her recommendation that the existing custody situation should remain in place.
We conclude that the trial judge did not abuse his great discretion in crediting the testimony of Dr. Roberts. She had excellent qualifications and had spent a sufficient amount of time with Thomas as his treating counselor to develop a reliable opinion on the situation. The trial court's decision to accord weight to her opinion was not error.

Basing the Opinion on Facts Alleged in Tommy's Post-Trial Brief
As her final assignment of error, Regina contends that the trial judge erred in including in his reasons for judgment facts that Tommy asserted in his post-trial brief which were not established at trial. Specifically, Regina complains that the following passage from the trial court's written reasons is objectionable:
The father is a vocational agriculture director in Jeff Davis Parish and has just been employed at Jennings High School. He and his family will be living in the Welsh-Jennings area.
Regina's point is well taken; Tommy testified at trial that he and his family were living in Singer and that he was teaching at Hyatt High School. Singer is located in Beauregard Parish, whereas Jennings and Welsh are in Jefferson Davis Parish. Regina asserts that the trial judge impermissibly derived this information from Tommy's post-trial brief.
Tommy's post-trial brief is not in the appellate record. Though the trial judge must have gotten the information from some source, we have no way of determining that the information was in fact derived from Tommy's post-trial brief. At trial, Tommy testified that he had resigned his position at Hyatt High School and was looking for another job. Apparently, in his post-trial brief, he related that he had found another job and had moved from Singer to the Jennings-Welsh area. In any event, based on the facts established at trial, it is clear that the trial court made a factual error. However, we conclude that the error was not material in relation to the ultimate resolution of the issue decided by the trial court. The material facts concerned the relative quality of life Thomas would experience in his mother's home as opposed to his father's home. We conclude that the trial judge decided this primary issue based on the facts of record established at trial. In this regard, the mention of Tommy's new residence and employment in the written reasons did not constitute reversible error.

DECREE
We affirm the trial court's judgment rendered in favor of plaintiff/defendant-in-rule/appellee, Thomas Oliver, Jr., and against defendant/plaintiff-in-rule/appellant, Regina Oliver. Costs of these proceedings are assessed to Regina Oliver.
AFFIRMED.