NOT DESIGNATED FOR PUBLICATION

STATE OF LOUISIANA
COURT OF APPEAL, THIRD CIRCUIT

23-205

SUSANA F. MOODY

VERSUS

ROSS MOODY

**********

APPEAL FROM THE
FOURTEENTH JUDICIAL DISTRICT COURT
PARISH OF CALCASIEU, NO. 2011-0528
HONORABLE CYNTHIA CLAY GUILLORY, DISTRICT JUDGE

**********

CANDYCE G. PERRET
JUDGE

**********

Court composed of Candyce G. Perret, Jonathan W. Perry, and Wilbur L. Stiles, Judges.

REVERSED AND RENDERED.

**Frank Alton Granger**
**1135 Lakeshore Drive, 6th Floor**
**Lake Charles,   LA 70601**
**(337) 439-2732**
**COUNSEL FOR DEFENDANT/APPELLANT:**
     **Ross Moody**

**Randy J. Fuerst**
**Fuerst, Carrier, Oden & Beasley, LLC**
**127 W. Broad Street, Suite 300**
**Lake Charles,   LA 70601**
**(337) 436-3332**
**COUNSEL FOR DEFENDANT/APPELLANT:**
     **Ross Moody**

**Susana F. Moody**
**In Proper Person**
**2922 River Crest Road**
**Corpus Christi,   TX 78415**
**PLAINTIFF/APPELLEE**
**IN PROPER PERSON:**
     **Susana F. Moody**

**Jennifer Jones Thomas**
**Kean, Miller**
**Post Office Box 3513**
**Baton Rouge,   LA 70821**
**(225) 387-0999**
**COUNSEL FOR OTHER DEFENDANTS:**
     **Dr. Patricia Post**
     **Dr. Jacqueline Braud**

**PERRET, Judge.**

This case involves the modification of a considered custody decree. By a considered decree, Ross Moody ("Ross") had sole custody of the parties' four children with Susana Moody ("Susana") being entitled to visitations at the Whistle Stop that were "actively monitored" and "recorded by video and audio[,]" as well as email communication. Susana filed a petition seeking sole custody of the children with reasonable visitation for Ross. At the time her petition was heard, only the twin girls remained minors and were subject to the custody arrangement. Susana also sought final periodic support and that Ross be held in contempt. The trial court granted Susana sole custody with Ross having visitation every other weekend, granted Susana final spousal support, and found Ross in contempt. Ross appeals. For the following reasons, we reverse the custody determination, reestablishing sole custody of the twin girls with Ross, but grant Susana visitation as specified herein. We also reverse the award of final periodic support[1] and ruling on the motion for contempt.

**FACTS AND PROCEDURAL BACKGROUND:**

Appellant-Defendant, Ross Moody, and Appellee-Plaintiff, Susana Moody, were married on June 29, 2001, and had four children of their marriage: two sons who have reached the age of majority, and twin girls, who were thirteen during the proceedings below.

Susana filed a Petition for Divorce on February 3, 2011, alleging physical and emotional abuse, seeking a temporary restraining order, sole custody of the four

---

[1] While the trial court and the pleadings refer to awarding Susana "permanent spousal support," we will use the terminology found in La.Civ.Code art. 112, which is "final periodic support," except when used in a quotation.

children, child support, termination of community property, interim spousal support, and final periodic support. Ross subsequently filed an Answer and Reconventional Demand alleging abuse and also seeking joint custody of the children and co-domiciliary status. On March 14, 2011, a hearing officer awarded Susana $750.00 per month in interim spousal support. The parties entered a stipulated judgment pending divorce, wherein Susana maintained primary custody of the children, but Ross was permitted visitation at the Whistle Stop at least once per week with reasonable communication permitted by telephone. This was later amended by a second Stipulated Judgment, permitting Ross visitation with the children every other weekend, to be supervised by his parents.

A judgment of divorce was rendered on March 6, 2012. On March 19, 2012, the trial court also upheld the continuation of the $750.00 per month in interim spousal support to Susana recommended by the hearing officer. Thereafter, the parties entered a Stipulated Judgment awarding the parties joint custody of the children, with Susana named the temporary domiciliary parent. On May 18, 2012, Susana filed a rule seeking final periodic support, or, alternatively, a continuation of interim spousal support.

On March 12, 2014, after a two-day trial, the trial court signed a judgment granting Ross sole custody of all four children. Susana was to leave the family home and spend the next two nights in a hotel. The children were not to be told of the judgment or upcoming custodial transition until they met with Dr. Patricia Post ("Dr. Post") the following day. Dr. Post was to notify and prepare the children for the custodial transition. Susana was also ordered to continue counseling with Sara McDonald ("Ms. McDonald") and was requested to prepare a letter to the children with Ms. McDonald's assistance to help ease the custodial transition. As for contact

2

and visitation with the children, Susana was prohibited from contacting the children unless that visitation was supervised at the Whistle Stop. It was required that those visits be "actively monitored" and "recorded by video and audio."

On April 8, 2014, the trial court signed an Order permitting Susana to communicate with the children through email, which would be monitored by Ross. Ross was to update Susana by email regarding the children once a week. Furthermore, Susana was ordered to "make regular contact with the children's treating psychologist, Dr. Pat Post, on the 1st and 15th of every month[.]" Susana was also "encouraged" to contact Ms. McDonald to schedule sessions to "discuss reasonable expectations" and how Susana can "best facilitate the children's adjustment and respond to their questions[.]" If it was determined between Ms. McDonald and Dr. Pat Post that supervised visitation was appropriate, then Ms. McDonald would initially supervise those visits between Susana and the children.

On September 1, 2017, Susana filed a Motion and Order for Spousal Support, noting that Ross was previously ordered to pay $750.00 monthly in interim spousal support and that the issue of final support was deferred to trial. The motion additionally alleged that Susana was ill and unable to work, supporting her need for final spousal support. Her doctor's reports were attached as exhibits.

On October 11, 2019, Susana filed a Rule to Modify Custody of the children seeking sole custody and permitting Ross visitation on alternating weekends, alternating holidays, and one month during the summer. Within the motion, Susana explains the reasons the prior judgment could not be complied with and that it is in the best interest of the children to be in her sole custody is because Ross undermines communication, and the nanny told her Ross was emotionally abusive to the children.

3

On March 30, 2021, Susana filed another rule for Spousal Support pro se. In response to this rule, Ross filed a Peremptory Exception of Prescription/Peremption and Ex Parte Motion to Dismiss Due to Abandonment. The trial court denied the exception. Writs taken to this court, as well as the supreme court, were denied.

Trial on Susana's petition for custody began on April 5, 2022. At this time, the eldest sons had reached the age of majority and only the twin girls remained involved in the custody proceedings. The trial concluded on October 21, 2022, and on the same day the trial court provided extensive reasons for ruling. The trial court signed a judgment on October 21, 2022, which granted sole custody to Susana, who lives in Corpus Christi, Texas. Ross and his wife, Heather Moody ("Heather"), were ordered to have no contact with the girls "in person, by text, email, or phone for one month." After one month, Ross was granted visitation every other weekend. Susana was ordered to immediately enroll the girls in counseling and participate with them in those sessions. Furthermore, Ross was "found in contempt for violating the court's orders" but the court did not assess attorney's fees or jail time. The court also determined that Susana was not at fault in the divorce and ordered Ross to pay Susana $750.00 per month in final spousal support retroactive to the date of filing. The judgment also made other determinations that are not at issue on appeal.

Ross filed a motion for new trial on November 3, 2022, which was denied. He then filed this appeal, listing four Assignments of Error:

> I) The [t]rial [c]ourt abused its discretion by finding:
>
> 1) Susana met her "heavy burden of proof" in a custody modification case and that the considered sole custody arrangement under Ross was "deleterious" without a substantial factual basis to support it;
>
> 2) Basing her decision to change custody in 2022 on perceived failures of the previous custody judgment from 2014;

4

> 3) A change of circumstances had occurred based upon the natural progression of time;
>
> 4) Against the uncontroverted opinions of the experts and basing its decision on her personal observations and prayer;
>
> 5) The record evidence of the fears and hesitation of the girls in reunifying with their mother did not require protective boundaries, and;
>
> 6) The best interest of the child standard of C. C. Art. 134 justified a change of custody from Ross to Susana.
>
> II) The trial court committed legal error and manifest error by denying Ross Moody's Motion to Dismiss Due to Abandonment and Peremptory Exceptions of Prescription/Peremption regarding Susana's spousal support claim;
>
> III) The trial court abused its discretion in finding Susana free from fault in the breakup of the marriage, and by awarding Final Periodic Support to her without hearing testimony/evidence regarding claimant's need and/or means of support and not specifying a retroactive date of support;
>
> IV) The trial court committed legal error and manifest error by holding Ross Moody in contempt for "failing to follow her court order" without due process.

## Assignment of Error One: Custody

In his first assignment of error, Ross appeals the award of sole custody to Susana, asserting that the trial court erred in finding that the evidence supported a finding that the current arrangement at the time was deleterious to the children and that such a modification was in the best interest of the children. Furthermore, Ross alleges the trial court erred in concluding that a "natural progression of time" equated to a material change in circumstance. Ross also alleges that the trial court erred in specifically basing its opinion on its "perceived failures of the previous custody judgment from 2014" and its "personal observations and prayer" rather than the "uncontroverted opinions of the experts." Lastly, he argues that the evidence

supported a finding that reunification with Susana required "protective boundaries" for the girls.

> A trial court's finding that a plaintiff has satisfied the requisite burden of proof to modify a considered custody decree is a question of fact which will not be disturbed absent manifest error. *Oliver v. Oliver*, 95–1026 (La.App. 3 Cir. 3/27/96), 671 So.2d 1081. As such, the trial court's finding will not be reversed unless a review of the record in its entirety reveals both that a reasonable factual basis does not exist for the trial court's finding and that the finding is clearly wrong. *Id.* Additionally, a trial court's ultimate determination regarding child custody is to be afforded great deference on appeal and will not be disturbed absent a clear abuse of discretion. *Martin v. Martin*, 11–1496 (La.App. 3 Cir. 5/16/12), 89 So.3d 526.

*Barlow v. Barlow*, 14-361, p. 3 (La.App. 3 Cir. 10/1/14), 149 So.3d 856, 859.

The Louisiana Supreme Court in *Mulkey v. Mulkey*, 12-2709, pp. 9–11 (La. 5/7/13), 118 So.3d 357, 364–65 (footnotes omitted), reviewed the burden of proof required to change custody set forth in a considered decree:

> The primary consideration in a determination of child custody is the best interest of the child. This applies not only in actions setting custody initially, but also in actions to change custody. A considered decree is an award of permanent custody in which the trial court receives evidence of parental fitness to exercise care, custody, and control of children. In an action to change custody rendered in a considered decree, additional jurisprudential requirements set forth by this court in *Bergeron v. Bergeron,* [492 So.2d 1193 (La.1986)] are also applied. . . . Thus, the burden of proof on the party seeking to modify custody is dictated by *Bergeron.*
>
> In *Bergeron,* this court considered whether the heavy burden of proof rule in modification cases should be continued. . . . Recognizing that the heavy burden of proof rule could inflexibly prevent a modification of custody that is in the child's best interest, and also cognizant of the need to protect children from the detrimental effects of too liberal standards in custody change cases, we restated the burden of proof rule as follows:
>
> > When a trial court has made a considered decree of permanent custody the party seeking a change bears a heavy burden of proving that the continuation of the

present custody is so deleterious to the child as to justify a modification of the custody decree, or of proving by clear and convincing evidence that the harm likely to be caused by a change of environment is substantially outweighed by its advantages to the child.

[*Bergeron*, 492 So.2d at 1200]

Thus, when a party seeks to change custody rendered in a considered decree, the proponent of change must not only show that a change of circumstances materially affecting the welfare of the child has occurred since the prior order respecting custody, but he or she must also meet the burden of proof set forth in *Bergeron*.

In *Barlow*, 149 So.3d at 860, this court summarized the above standard as follows:

> In an action to modify a considered custody decree, the plaintiff must first show that a change of circumstances materially affecting the welfare of the child has occurred since the prior custody order. *Bergeron v. Bergeron*, 492 So.2d 1193 (La.1986). Next, the plaintiff must show that continuation of the present custody is so deleterious to the child as to justify a modification of the custody decree, or, by clear and convincing evidence, that the harm likely to be caused by a change of environment is substantially outweighed by its advantage to the child. *Id*. If a court finds the plaintiff has met this burden, it must then modify custody pursuant to the child's best interest. *Id*. In modifying custody pursuant to the child's best interest, the court shall consider all relevant factors. See also La.Civ.Code art. 134. Additionally, the court is not limited to the requested relief and may grant any relief to which a party is entitled. La.Code Civ.P. art. 862.

In *Gray v. Gray*, 11-548, p. 20 (La. 7/1/11), 65 So.3d 1247, 1259, the supreme court found that the mother's rehabilitation from drug use was not a "change in circumstances which materially affects the child's well-being so as to warrant a change of custody" and does not meet "the threshold of *Bergeron* to warrant the trial court's modification of a considered custody decree." The court noted that while her drug use was previously considered, other reasons existed for awarding the father with domiciliary custody. However, *Gray*, 65 So.3d at 1260, went on to reiterate that:

7

[T]he "heart of the *Bergeron* heavy-burden rule is the concern that a child's best interest and welfare could be irreparably damaged by mistaken changes in custody or even by the effects of an attempted or threatened change of custody on grounds that are less than imperative." *Johnson v. Johnson*, 93–1015 (La.App. 1 Cir. 3/11/94), 634 So.2d 31, 33 (citing *Bergeron* and Blakesley, *Louisiana Family Law*, § 12.39 (1993)). The party seeking a change in custody, therefore, must produce sufficient evidence to support a finding that the claimed change in circumstances has adversely affected the child. *Smith v. Smith*, 615 So.2d 926 (La.App. 1st Cir.), *writ denied*, 617 So.2d 916 (La.1993).

In *Barlow*, 149 So.3d 856, the mother petitioned to modify custody from a prior considered joint-custody decree to sole custody in her favor. She alleged that since the original considered decree, the father had moved out of his second marital home, had no permanent home and was living with his son, left the minor in the care of his son who had criminal charges and a drug-related conviction, engaged in physical altercations with his son in front of the minor, failed to supervise the minor properly resulting in an injury to her, and failed to exercise physical custody and did not contact her for eight weeks on two occasions. The mother presented evidence that the father's failure to exercise custody or contact the minor negatively affected the minor. The trial court found the mother carried her burden considering *Bergeron*, and particularly noted:

> [S]ince Mr. Barlow and his second wife separated, he'd "lost control of his life," which made caring for Ashley difficult. The trial court then expressed several concerns about the effect of the current custodial arrangement on Ashley, such as her missing school while in the care of Mr. Barlow and possible exposure to drug use in Mr. Barlow's current residence. The court noted that the child did not feel welcome in her father's current residence. Additionally, the court noted Mr. Barlow's lack of notice and inconsistency in visitation "stymied" the child.

*Id*. at 861. The appellate court agreed that the evidence supported the trial court's findings and found no manifest error in the trial court's modification of custody.

In *Gallet v. Gallet*, 11-1416 (La.App. 3 Cir. 3/7/12), 86 So.3d 179, *writ denied*, 12-786 (La. 5/4/12), 88 So.3d 468, the father sought to modify a considered decree

8

setting forth joint custody with domiciliary status to the mother. The father sought sole custody or, alternatively, domiciliary status. He cited several of his daughter's caretakers to support his argument that the mother caused emotional harm and brought on his daughter's anxiety. However, the trial court noted that several of the experts testified the anxiety was due to the tension between the parents and that the mother did not cause any emotional damage, that the daughter was happy with the current arrangement. The trial court "described the nature of [the father's] allegations as 'relatively minor'" which the appellate court agreed was a finding supported by the record. *Id*. at 183. Additionally, the appellate court agreed that the record supported the "ultimate determination that these purported events were not 'so deleterious to the child as to justify a modification of the custody decree.'" *Id*. (quoting *Bergeron*, 492 So.2d at 1200).

After a review of the record and the trial court's reasons in open court, for the following reasons we find that the record does not support the threshold determination that Susana met the *Bergeron* standard to modify custody.

The trial court provided reasons for its judgment that relied more on the court's own beliefs and opinion that the prior judgment was unfair rather than whether the evidence, the testimony of the parties, the testimony of the experts, and even the testimony of the girls in their *Watermeier*[2] hearing supported a finding that *Bergeron* was met and whether sole custody to Susana was in the best interest of the children. The trial court also seemingly punishes Ross for complying with the prior judgment, which set forth specific requirements for Susana to contact the children.

After reciting the applicable standard, *Bergeron*, the trial court stated:

---

[2] *Watermeier v. Watermeier*, 462 So.2d 1272 (La.App. 5 Cir.), *writ denied*, 464 So.2d 301 (La.1985).

I do think that the present custody is deleterious to the children, in that there is a change in circumstances, in that in 2011 they were two, 2014 they were five, now they're 13. Eight years without even as much as the ability – they were too young for e-mails back then in 2014 – not even the ability to talk to them or text them.

And then Jessica Saki[3] testified that, "If you see her name and number in the caller ID, don't answer it." Jessica Saki felt the need to allow the boys, because they were older, to use her phone. She snuck behind her employer's back and used her phone to allow Daniel and David to have some contact with their mother. Surely, they are apprehensive. Surely, they don't trust. Surely, they don't know what to expect because they've not been allowed to build a relationship with the mother that birthed them and also with the mother that had them until 2014. So, yes, they're going to exhibit some hesitancy, but it's conflicting because when you listen to the audio recording which has been introduced into evidence, they're all excited. They're planning what to get and, and where – what they're going to do, and what movies they're going to watch, and what games they're going to play. And, when they get home everything changes. And, I think that it's so much so that it's conflicting for them. They want to please dad, they want to be with mom, they don't quite know what to say, what to do. They don't want to be too happy when they come back or show that they had a good time because then maybe dad would get upset, not that he's even exhibited that, but in their mind that's what they're thinking.

And they are great actors. I noticed that. . . . My observation of them after talking to them . . .

. . . But with regard to [E.S.M. and E.K.M.[4]], we had a great conversation seated in the courtroom, and the transcript will reflect they expressed to me just what I said. First, they thought mom was dead; Daniel told them that she was dead; they didn't understand; they had some questions; we went through the Mama Heather thing; we went through the kitty cats. . . . [E.S.M] was angry with mom because she made [E.K.M.] faint at the - - David's graduation. But she didn't know that until someone told her. She didn't see it herself. So it goes along with the testimony Mr. Moody gave about, "they talk about mom with each other. They hear each other. And they formulate their own opinions and are very protective of each other." So [E.S.M.] is like, "I don't trust

---

[3] The witness's name is correctly spelled Jessica Zaki ("Ms. Zaki"), according to her spelling in the transcript when she took the witness stand. Ms. Zaki was the children's nanny.

[4] Although we are not required to use initials to insure the confidentiality of minors in child custody cases under Uniform Rules of Louisiana Courts of Appeal Rule 5-2 or the Third Circuit's Internal Rule 3.2, we do so here. *See Moody v. Moody*,19-642 (La.App. 3 Cir. 2/5/20 (unpublished opinion), *writ denied*, 20-523 (La. 9/8/20), 301 So.3d 35; *Rocock v. Pommier*, 16-809 (La.App. 3 Cir. 2/1/17), 225 So.3d 512, *writ denied*, 17-631 (La. 5/1/17), 221 So.3d 70; *Arrington v. Campbell*, 04-1649 (La.App. 3 Cir. 3/9/05), 898 So.2d 611.

mom. She hurt [E.K.M.]" [E.K.M.] is like, "No she didn't hurt me." That was like their first time seeing her after all these years.

And, so before that conversation ended, [E.K.M.] wanted to see her mom that day. And I went outside and asked you all would that be okay. [E.S.M] said, "I don't think so, but I'll go if David goes." Which, again, is far from what you testified to. David came in, and just as Dr. Turner pointed out, [E.S.M] kind of cowered in the corner next to David. [E.K.M.] jumped on her mom before her mom could get in the room, hugging her and kissing her. And then they finally came into the room, sat down, talk to her a while. The Grandparents were there. It was just an amazing site for me because I'm observing everything. Because I'm not quite sure how to proceed in this. And, then I saw [E.S.M] kinda move over and sat across from her mom, in the chair across from her mom, and she's just kinda looking at her mom, I think just kind of sizing her up and out feeling her out. And I think Ms. Moody went out to the car to get some little trinkets or whatever, so [E.S.M] pulled my robe and said, "Judge, I think I trust my mom now. I want to spend time with my mom." And I said, "Oh, baby, you going to make Judge cry." I said, "Are you sure?" And she said, "yes." And, I saw a completely different child. So I know that they're not afraid of their mother. And I know what the professionals are saying. I know what I observed. That day two teenagers long for a relationship with their mother. That's why I ordered the visitation despite what every expert told me. Because I prayed about it, and I know what I saw in those kids. I know what I saw in their eyes. And I know the love that they expressed. They are apprehensive, yes, they are. But that day they really threw caution to the wind.

In accordance therewith, I also have some concerns about -- even when Susana is trying to exercise a visitation, the exhibits have shown, Heather will text. That's Susana's time. Y'all are not even giving her a chance to establish a relationship with all four of her children, even despite the fact that the boys are majors now. They're still receiving text all through the visitation. They're still receiving phone calls. Give her a chance without interference.

This record consist[s] of 20 -- 20 volumes. I've heard the testimony of all the witnesses. I've reviewed the demeanor. I've gone over all 20 volumes in the record. I've read all the expert reports. There are 21 or so judgments in here. There are six or more hearing officer conferences. There is a change in circumstances; they are much older now, situations, facts have changed. I then turned, not only to Bergeron and the cited cases, I turn to Civil Code Article 134 in determining the best interests of the child or children. . . .

The only fact that has changed in this case since 2014 is that the girls have grown older.[5] While it is true that approximately eight years passed with Susana having little to no contact with the children, this continued alienation was largely a result of Susana's own actions, or lack thereof. While the trial court had an issue with the children's lack of ability to contact their mother or vice versa, that is what the prior judgment ordered. The fact is, on the record, Susana has not taken steps to change the 2014 judgment or to comply with that order. She also removed herself from Louisiana to Corpus Christi, Texas, and changed her email and phone number immediately following the 2014 judgment. This court has previously noted the same in *Moody v. Moody*, 19-642, p. 8 (La.App. 3 Cir. 2/5/20) (unpublished opinion), *writ denied*, 20-523 (La. 9/8/20), 301 So.3d 35: "Susana has not seen the children in years and has not pursued the necessary steps set forth in the previous opinions to start seeing the children."

Furthermore, the record does not support some factual findings and conclusions made by the trial court. The trial court was obviously bothered by the fact the girls believed, at one point, that their mother was dead; however, the record does not support concluding that this was an ongoing belief of the girls. The record shows that, while their brother did tell them this, Ross and the nanny, Ms. Zaki, quickly corrected the statement and told the girls that their mother was alive and

---

[5] In *Silbernagel v. Silbernagel*, 10-267 (La.App. 5 Cir. 5/10/11), 65 So.3d 725, the trial court and fifth circuit did reference the son's maturity over the years as one reason that a material change of circumstance was found. However, in that case, the court noted that the son lived in Houma and attended school in Metairie, where his friends were located, and where he began showing an interest in after-school and social activities as he matured. The record indicated that despite his interest, his living situation prevented his enrollment. The court also had additional reasons for finding a material change in circumstances. The court maintained joint custody, but modified the domiciliary status to co-domiciliary and modified the physical custody schedule to include more time with the father when the mother would not be traveling to New Orleans for work.

12

loved them very much. In fact, the girls explained this to the judge during the *Watermeier* hearing.

Regarding the court's *Watermeier* hearing and an off-the-record meeting with the judge, the girls, and Susana, the trial court found that the girls wanted to spend time with their mom, but that finding should not be construed as the girls' desire to live solely with their mother. During the *Watermeier* hearing, one of the girls admitted that sometimes she does not respond to her mother's emails because she is simply doing other things and then it is nighttime. One pled to the judge, "Please don't take me away from my family." But she admitted that she would be okay with *visiting* with Susana and suggested doing so during school breaks or summer. At no point during the interview did the girls express a desire to move and live with their mother as their sole custodian.

The trial court also largely ignored Darrell B. Turner, Ph.D. ("Dr. Turner"), appointed by the court to provide a psychological child custody evaluation, who met with Ross, Susana, Daniel, David, and the twins. He also met with the twins together with Daniel and Susana, and the twins together with "Mama Heather," their stepmother. Daniel told Dr. Turner that "in the past, [Susana] has taken things he has said out of context and has used them against Ross." He also stated that conversations with his mother "soon turned into her trying to find out information about Ross" and he described her as manipulative. In Daniel's opinion, it is best for the twins to remain with Ross.

In Susana's interview, Dr. Turner said, "there were times when she appeared manipulative" and "engaged in near constant denigration and character assassination of Ross."

Dr. Turner concluded by providing his opinion regarding custody:

13

Giving Susana the utmost benefit of the doubt, in closing our telephonic conversation today (4/10/2022), I asked, hypothetically, if the Court were to provide for joint custody of their minor children between her and Ross, would she be willing to move to Lake Charles in order to be with her children. Her response was, "joint custody won't work." I then re-asked the question, specifically to ascertain her intentions, and she stated, "If they gave me my house back." . . . . In my professional opinion, based on my education, training, and experience, separating the twin daughters from their father and new step-mother whom they genuinely seem to love as well as from their brothers who have been the only constant family in their lives up to this point by awarding full custody to Susana and requiring the girls to move to Corpus Christi, Texas, would be quite far from a recommendation that is within the best psychological interest of these children. It appears that Susana will only accept a fully custody recommendation that is in her favor, essentially taking the children from their father who has only cared for and loved them in their mother's absence.

Given this, it is clear that, while confused and hurt and, in some cases, ignorant as to the truth, these girls do love their mother. While at times that relationship has been unhealthy, there is potential for a positive outcome as it pertains to a future with their mother. Susana carries a great deal of pain and resentment toward Ross, and she absolutely must curb this and separate it from her relationship with her daughters if there is to be any chance of a positive outcome for them. And I do believe that having a healthy relationship with their mother is in the best psychological interest of these girls. But that will take time. . . . [Dr. Turner then explained a slow and supervised reunification with Susana].

. . . .

. . . I do not feel that the custody decision should be "held ransom" by a demand of either full custody for Susana or joint custody and the return of their marital home to her. . . . If Susana is not willing to move here or travel here to spend every other weekend with her daughters, and if she will only "accept" the above noted conditions, then I feel it may truly be in the best interest of the children to remain in the care of their father and step-mother, be close to their brothers, and finish out what is left of their childhood absent the bitterness and contempt between their parents being constantly banded out between them or to them.

In his testimony, Dr. Turner recommended that "this needs to be a closely monitored and graduated reintegration process. And it needs to be monitored by mental health professionals." While he believed a relationship with their mother is in their best psychological interest, he believed that relationship needed to be supervised initially to prevent any "additional manipulation or damage[.]" Dr. Turner further opined that he doesn't "think that there is - - that [sole custody to Susana] is what's in the best psychological interest of the children to be taken from their father for no apparent reason." In response to questioning by the court, Dr. Turner expanded on this opinion:

> I think [the girls] have already had enough tumultuousness. I think it's time for something to remain the same, and I don't think that upending them and moving them to a new town and a new school and new friends and everything, and, you know, potentially splitting from their brothers who may remain here for college, we don't know. And that may happen anyway. But - - plus, that's essentially pulling them from Mr. Moody, who hasn't done anything to deserve losing his children. You know, he's taken care of them. He's a loving father. I don't see a reason to warrant that. I couldn't find anything that would warrant doing that to them or to him.

The trial court then inquired:

> THE COURT:
> I have to ask this because I am the trier of fact. If I decide today that I'm going to place [E.K.M.] and [E.S.M.] with their mother, how much harm have I done?
>
> DR. TURNER:
> I mean, it would be considerable.

Lastly, Dr. Turner explained his reasons for suggesting the inclusion of mental health professionals in visitation with Susana:

> One thing that I - - that you see with someone with that personality makeup is that - - is that it's not as if - - not only is all or nothing, but it's all on their say and their - - their way. Or nothing. And so what we saw since 2014, when she lost custody of the children, if you read that transcript, she essentially just threw her hands up and said then I'm out. I'm too hurt by this to have anything to do with them for

a while. That's what we're - - that was - - that to me is like a crystallization of what we're dealing with . . . . in terms of her needs and emotions over the children. And that's why I'm - - that's why. I mean, I - - you said you could tell I gave this a lot of thought. I gave this so much thought. And I just don't see a way of it - - because if it doesn't work, it could be harmful. And I don't see a way of it working without some real mental. . . . health intervention."

The trial court noted during trial that she reviewed the reports of Dr. Turner; B. Tucker Savant, M.A. ("Mr. Savant"), LPC; Dr. Post; and Dr. Jacquelyn Braud ("Dr. Braud"). Mr. Savant, the court appointed expert for reunification therapy, evaluated the girls and their parents to develop a reunification plan based on a court order. Both girls expressed a desire to know their mother but wanted to proceed in small steps. E.K.M. expressed that she was happy she and her mother had been communicating via e-mail since spring break. Mr. Savant opined that a slow reintroduction of the girls to their mother would be most appropriate, recommending two phases, the first consisting of a thirty-day period of email communication with E.S.M and then a sixty-day period of audio or video telephone conversations with both girls prior to any visitation. Individual and family counseling was recommended for all parties to prepare for supervised visits with Susana. During phase two, Susana would be permitted supervised visitation every other weekend for limited hours, and visitation during Thanksgiving and Christmas holidays during the weekends that the children are not in school, plus an additional visitation agreed upon by Ross and Susana.

Dr. Braud, who has treated E.S.M. in the past, similarly made a recommendation pertaining to E.S.M that any increased maternal involvement should be a "gradual, progressive plan for increased exposure and visitation . . . starting with brief, supervised visitations in a familiar environment."

16

This court also reviewed the recommendation from Dr. John C. Simoneaux ("Dr. Simoneaux"), dated February 22, 2014, prior to the change in temporary sole custody with Susana to sole custody with Ross. In that report, Dr. Simoneaux came close to opining that neither parent was well suited to be the custodian of these children, but that no extended family was available for the task. When it came to it, Dr. Simoneaux noted that the children had all regressed while in Susana's care, and that Susana is very critical of Ross, likely in front of the children. In fact, he stated, "This custody arrangement, with Susana being the primary domiciliary and physical custodian is not working, and appears to involved [sic] some degree of toxicity for the children. The circumstance has regressed and I fear there is more to come." He opined that joint custody simply will not work. He was satisfied that Susana "will eventually succeed in demonizing this father to their children to a degree where they will be in terror in his presence." The final recommendation, "possibly the only recourse available[,]" was for Ross to have sole custody of the children and Susana to begin with supervised visitation and progress from there.

As to the girls' current well-being and environment, they have lived in the same community and state their entire lives. The progress reports for both girls were admitted into evidence as well as Ross's testimony on the matter and the girls are doing well in school, they have been A and B students while in Ross's custody as well as honor and banner roll students. E.K.M. has also been recently nominated for student of the year, her second nomination. Ross did mention that E.S.M had some disruptive behavior in school in 2019, for which he brought her to Dr. Braud.

Furthermore, the girls told the trial court during the *Watermeier* interview that they get along with their new blended family, with one stating she loves all her siblings, even though they do fight. In Dr. Turner's report, he noted that the twins

17

interacted with their stepmother on the day of the evaluation and "literally ran and jumped on her upon seeing her. One child told me that she is happy because Heather is in their life now." Dr. Turner observed that "[t]his is the most active and happy I have seen these children over the course of the entire evaluation. They presented almost as different children." Additionally, as mentioned above, one of the girls specifically asked the trial court not to take them away from their family.

As to the advantages of a change in custody, none were really discussed. The change would obviously allow the girls to be with their mother and her parents, but there were no specific advantages to the change in custody aside from this fact. Instead, the trial court's judgment takes the girls away from the only family, friends, school, and environment that they have known for the last eight plus years and places them in a completely different state.

Simply put, the only evidence presented by Susana to meet her burden in proving custody should be modified was that the girls have gone eight years without contact with her and that Ross and his wife contacted the girls during the court-permitted visitation with Susana. The natural progression of age is simply not a material change in circumstance when there is no evidence that the change negatively impacts the welfare of the child, which is the ultimate question to be answered in determining a material change in circumstance. *See generally LeBlanc v. LeBlanc*, 06-1052 (La.App. 3 Cir. 2/14/07), 951 So.2d 500, *writ denied*, 07-562 (La. 4/5/07), 954 So.2d 146 (wherein the court considered a consent decree but discussed the requirement to find a material change in circumstance). Additionally, contact with the girls during Susana's visitation, checking on them and telling them they love the girls, does not amount to a material change in circumstance, especially

18

considering the remainder of the evidence supports the conclusion that Ross and Heather have attempted to foster a good opinion of Susana with the girls.

Additionally, Susana had to prove that maintaining sole custody of the children with Ross would be deleterious to the girls as to warrant modifying custody, or Susana had to prove "by clear and convincing evidence that the harm likely to be caused by a change of environment is substantially outweighed by its advantages to the child." *Bergeron*, 492 So.2d at 1200. After our review of the record, we find insufficient evidence to support the trial court's finding that Susana met the required and heightened burden of proof set forth in *Bergeron* to warrant the change in sole custody from Ross to Susana. In fact, although the trial court recites the *Bergeron* standard, it did not apply the standard to the facts of this case. There is no evidence to prove a material change in circumstances negatively impacting the welfare of the girls or the test of *Bergeron*. Without such a finding, it is legal error to find that Susana met *Bergeron*, thus warranting a de novo review. Having found that Susana did not meet the high standard in *Bergeron*, we find that it was error to change sole custody from Ross to Susana. We therefore find that sole custody is granted to Ross.

While we have concluded that the record does not support a finding that Susana carried her burden in meeting the *Bergeron* standard to modify custody, on our de novo review, we also recognize that an alteration to visitation does not require meeting such a high standard. "[V]isitation schedules can be altered when conditions warrant it, even when there lacks evidence supporting the modification of a prior considered custody decree." *Mason v. Mason*, 16-287, p. 14 (La.App. 3 Cir. 10/5/16), 203 So.3d 519, 529. "[A]s a practical matter, courts may 'tweak' visitation schedules even when the evidence will not support modifying a prior considered decree under *Bergeron*. . . . Visitation is always open to change when the

19

conditions warrant it." *Brantley v. Kaler*, 43,418, pp. 6–7 (La.App. 2 Cir. 6/4/08), 986 So.2d 188, 191.

Louisiana Civil Code Article 136(A) states that "a parent not granted custody or joint custody of a child is entitled to reasonable visitation rights unless the court finds, after a hearing, that visitation would not be in the best interest of the child." As there are issues with the 2014 judgment, for example the inability of the Whistle Stop to accommodate the recorded visitation, and with a complete record before us, we will consider the best interest of the child factors in determining an appropriate visitation schedule for Susana in light of the history of this family. The best interest of the child factors are found in La.Civ.Code art. 134 and we will discuss each in turn.

1. "The potential for the child to be abused, as defined by Children's Code Article 603, which shall be the primary consideration." La.Civ.Code art. 134(A)(1).

Susana has made some allegations of abuse against Ross as it pertains to her, Daniel, and the girls, and Dr. Turner's report does discuss the volatile relationship as described by Ross prior to the divorce. In Dr. Turner's conclusions, however, he sums up these allegations by stating that the "[a]ccusations of physical abuse have changed or disappeared on the part of Susana across various documents and statements both in the records and in our interviews." Even Dr. Simoneaux in 2014 stated regarding Susana's allegations, "I hope the unfounded allegations of abuse and neglect can stop." However, he also noted that he does not believe either parent has any designs on hurting the children.

On the other hand, Dr. Turner did opine that there may be some potential for emotional abuse and manipulation of the children by Susana.

20

Our review of the record does not support a finding that there is a potential for the children to be physically abused by either parent, while there is some suggestion that Susana may cause some damage through manipulation of the children.

2. "The love, affection, and other emotional ties between each party and the child." La.Civ.Code art. 134(A)(2).

It is evident in the record that the girls have strong ties to their father. E.K.M. was quoted by Dr. Turner as saying that she loves her daddy and told the trial court during the *Watermeier* hearing that she loves all of her blended family. While both girls expressed some feelings of abandonment caused by their mother, both girls expressed a desire to get to know their mother. However, E.K.M. begged the court not to take her away from her family.

It is also evident that both parties love their children as both have vehemently advocated for custody throughout the course of these proceedings.

3. "The capacity and disposition of each party to give the child love, affection, and spiritual guidance and to continue the education and rearing of the child." La.Civ.Code art. 134(A)(3).

The record does not indicate that either party would fail to provide spiritual guidance to the children. Additionally, both are trained chemical engineers capable of continuing the education of these children. The record is supportive of a finding that Ross is capable, and does, give the children love, affection, and spiritual guidance as well as continues their education. As discussed herein, Dr. Turner reiterates this fact in his report. Susana obviously loves her children. She reminds them of that fact in her communications with them and demonstrates that she thinks of them often. She also displays her affection by buying them gifts and putting thought into activities that they can do together while visiting. However, her efforts

21

are also hindered by the built-up resentment towards Ross and others for what has happened throughout these proceedings.

As discussed again below, Susana has, in the past, been dismissive of her relationship with her eldest son Daniel, leaving him feeling as though she did not value their relationship. Dr. Turner has also opined that he has a legitimate concern that Susana's emotional damage "may be too much and to[o] scarring to allow her to separate that aspect of her life from her relationship with her daughters."

4. "The capacity and disposition of each party to provide the child with food, clothing, medical care, and other material needs." La.Civ.Code art. 134(A)(4).

This factor weighs equally in favor of both parties. Ross has obviously cared for the children and their extensive medical needs for the preceding eight years. However, while exercising court-permitted visitation during the recent proceedings, Susana also demonstrated that she could care for the children's medical needs, as well as their other needs. Both parties are chemical engineers and are employed, though Susana claims to be in financial duress due to child support arrearages that are garnished from her wages and the lack of spousal support.

5. "The length of time the child has lived in a stable, adequate environment, and the desirability of maintaining continuity of that environment." La.Civ.Code art. 134(A)(5).

This factor clearly favors Ross, as he has been in sole custody of the children for the preceding eight years pursuant to the 2014 considered decree. The girls lived in Calcasieu Parish their entire lives until sole custody was given to Susana in 2022. The only change in school has been the natural progression through grade levels. Ross has provided for their medical and emotional needs as well as food, clothing, housing, etc.

Dr. Turner also opined:

22

In my professional opinion, based on my education, training, and experience, separating the twin daughters from their father and new step-mother whom they genuinely seem to love as well as from their brothers who have been the only constant family in their lives up to this point by awarding full custody to Susana and requiring the girls to move to Corpus Christi, Texas, would be quite far from a recommendation that is within the best psychological interest of these children.

6. "The permanence, as a family unit, of the existing or proposed custodial home or homes." La.Civ.Code art. 134(A)(6).

The above quote from Dr. Turner is also applicable here. Ross and the twin's two older brothers, Daniel and David, have been the only constant family in the girls' lives up to now. When Susana was denied custody in 2014, she was permitted to write the girls a letter explaining why she would no longer be living with them, but she did not. She also did not pursue modifying the custody judgment for years. The evidence supports the conclusion that the girls have felt abandoned by Susana for the last eight years. Furthermore, Susana has been somewhat dismissive of her relationship with Daniel in the past when she stated she would go away and never see him again if he didn't want her in his life. Daniel expressed to Dr. Turner this "left him feeling that she didn't value their relationship."

7. "The moral fitness of each party, insofar as it affects the welfare of the child." La.Civ.Code art. 134(A)(7).

Although Ross suggests that Susana is not morally fit based on her alleged constant degradation of him in front of the children, we find that that accusation is more appropriately discussed under factor twelve, the parties' ability to facilitate a relationship with the other parent. Based on the record, we cannot say that either party is morally unfit or that their moral fitness affects the welfare of the children in a negative way.

23

8. "The history of substance abuse, violence, or criminal activity of any party." La.Civ.Code art. 134(A)(8).

The record simply does not support a finding that either party has a history of substance abuse, violence, or criminal activity.

9. "The mental and physical health of each party. Evidence that an abused parent suffers from the effects of past abuse by the other parent shall not be grounds for denying that parent custody." La.Civ.Code art. 134(A)(9).

There is no evidence in the record that either party is physically unfit. Regarding mental health, as explained in the record at length, there is evidence that Susana continues to hold animosity towards Ross and blames everyone aside from herself for losing custody of her children, her financial situation, and the toll that the divorce and 2014 custody proceedings took on her mental health. That said, the record indicates that she has continuously sought treatment and therapy in the past and continues to do.

10. "The home, school, and community history of the child." La.Civ.Code art. 134(A)(10).

As mentioned above, the girls have lived their entire lives in the same community and have progressed through the same local school system until the 2022 Judgment awarded Susana sole custody in Corpus Christi, Texas. The girls also lived in the same home until the remarriage of their father, after which they moved into a larger home with their stepmother and stepsiblings.

11. "The reasonable preference of the child, if the court deems the child to be of sufficient age to express a preference." La.Civ.Code art. 134(A)(11).

The girls did have the opportunity to express their feelings to the trial court in the *Watermeier* hearing. As previously mentioned, both girls expressed a desire to know their mother, but expressed that they wanted to visit her, possibly on school breaks and holidays. They did not want to be removed from their current home.

24

12. "The willingness and ability of each party to facilitate and encourage a close and continuing relationship between the child and the other party, except when objectively substantial evidence of specific abusive, reckless, or illegal conduct has caused one party to have reasonable concerns for the child's safety or well-being while in the care of the other party." La.Civ.Code art. 134(A)(12).

Based on the record and the expert reports, this factor weighs in favor of Ross. It has been stated that Ross corrected the children if they would negatively speak about Susana. Regarding Ross, Dr. Turner specifically stated:

> I feel the outcome lies in the willingness of Susana to make sacrifices and put in a great amount of work. Ross has nothing to defend or prove. He has acted as a loving father, and his willingness to still, after all that has occurred, be open to healing the relationship between his children and their mother speaks to his love for his sons and daughters.

Regarding Susana, Dr. Turner noted that she "engaged in near constant denigration and character assassination of Ross." He believes that she must curb her pain and resentment toward Ross and "separate it from her relationship with her daughters if there is to be any chance of a positive outcome for them." It was a legitimate concern for him that Susana's emotional damage "may be too much and to[o] scarring to allow her to separate that aspect of her life from her relationship with her daughters."

There is some evidence that Susana spoke about Ross and the court proceedings to Daniel, and Dr. Turner stated that all four children reported she had negative comments about Ross. Specifically, Dr. Turner testified that Susana would make statements "to sort of pull them to her side and devalue their father." He found this behavior was supported by the text messages he reviewed.

However, this court would also note that Dr. Turner opined that Susana behaved with the girls in an appropriate way during their meeting. Dr. Turner's court testimony also occurred in April 2022, prior to several permitted visitations with

25

Susana. The only evidence in the record that Susana disparaged Ross in front of the girls during these visits would be Ross's testimony and progress notes from Dr. Braud following some visitation with Susana. Ross testified that while he spoke with the girls during their first two visits with Susana, he did not speak with them during the last two because the girls asked him not to call. The girls explained to Ross that Susana gets upset when he calls. Dr. Braud's notes indicated that [E.K.M.] reported that Susana often inquired about their relationship with their stepmother and expressed her dissatisfaction with that relationship and how often the girls correspond with their stepmother as well as accused the girls of not loving her.

13. "The distance between the respective residences of the parties." La.Civ.Code art. 134(A)(13).

Ross lives in Sulphur, Louisiana while Susana lives in Corpus Christi, Texas. A significant distance exists between the two residences which would prevent any type of weekly visitation and make it difficult for any type of family counseling as recommended by the experts. However, in the past, the parties have managed to meet in the middle to exchange the children for every other weekend visitation.

14. "The responsibility for the care and rearing of the child previously exercised by each party." La.Civ.Code art. 134(A)(14).

Both parties have been responsible, at one point or another, for the care and rearing of the children. Obviously, Ross has demonstrated his responsibility the preceding eight years while the children have been in his custody. However, during the marriage, Susana was the main caregiver to the children. Susana was a stay-at-home mother while Ross worked regularly. After the divorce proceedings were initiated, Susana was given temporary sole custody of the children until 2014. Since custody was awarded to Ross, however, Susana went years without challenging that order and also failed to pay child support until the state began garnishing her wages.

26

After a review of the record, the factors listed above, the advice of the experts that a relationship with Susana would be beneficial to the girls, and the girls' own expressed desire to spend time with their mother, we find that visitation in favor of Susana is warranted. Furthermore, considering the history between all involved in this case, we find that the prior 2014's judgment setting forth limited visitation is no longer sufficient. Thus, we find the following visitation schedule to be reasonable:

Sole custody of E.S.M., DOB 03/22/2009 and E.K.M., DOB 3/22/2009 is granted to Ross Moody.

Ross Moody shall enroll the children in counseling immediately.

Ross Moody shall immediately enroll the minor children in school.

Susana Moody will have reasonable visitation with the minor children as follows:

**1.     School Year Visitation Schedule:**

During the school year, Susana Moody shall have visitation with the children every other weekend from Friday at 6:00 p.m. to Sunday at 6:00 p.m.

**2.     Summer Visitation Schedule**

This schedule replaces the School Year Visitation Schedule and begins the second Friday after the termination of school. During the summer months, visitation and physical custody of the children will be as follows:

- In *even* numbered years, Susana will have visitation with the children from 6:00 p.m. on the second Friday after the termination of school for two consecutive weeks until 6:00 p.m. on Friday, when Ross will then have physical custody of the children for two consecutive weeks. Then, Susana will have visitation from 6:00 p.m. on the first Friday in July for two

27

consecutive weeks until 6:00 p.m. on Friday, after which Ross will have physical custody of the children for two consecutive weeks.

- In *odd* numbered years, Ross will have physical custody of the children from 6:00 p.m. on the second Friday after the termination of school for two consecutive weeks until 6:00 p.m. on Friday, when Susana will then have visitation for two consecutive weeks. Then, Ross will have physical custody from 6:00 p.m. on the first Friday in July for two consecutive weeks until 6:00 p.m. on Friday, after which Susana will have visitation with the children for two consecutive weeks.

- Susana shall also be granted the right to have visitation with the children the first weekend in August, prior to school resuming, from Friday at 6:00 p.m. until Sunday at 6:00 p.m.

**3.  Holiday Visitation Schedule**

The parents shall alternate the visitation and physical custody of the children for the following holiday periods:

a. <u>Thanksgiving</u>:  Susana's visitation with the children will be as follows for this holiday:  In *even* numbered years, 6:00 p.m. the day before Thanksgiving until school resumes.  In *odd* numbered years, from the last day of school at 6:00 p.m. until 6:00 p.m. the day before Thanksgiving.  This visitation supersedes all other visitation periods.

b. <u>Christmas/New Years</u>:  Susana's visitation with the children will be as follows for this holiday:  In *even* numbered years, from 6:00 p.m. December 21 until 6:00 p.m. December 24.  In *odd* numbered years, from 6:00 p.m. December 24 until 6:00 p.m. December 27.  This visitation supersedes all other visitation periods.

28

c. <u>Mardi Gras</u>:  Susana's visitation with the children will be as follows for this holiday:  In *even* numbered years, from 6:00 p.m. the Sunday before Mardi Gras until 6:00 p.m. the day before school resumes.  In *odd* numbered years, from the termination of school on the Friday before Mardi Gras at 6:00 p.m. until 6:00 p.m. on the following Sunday.

d. <u>Easter and Spring Break</u>:  Susana's visitation with the children will be as follows for this holiday:  In *even* numbered years, from 6:00 p.m. the Thursday after school terminates for this holiday until 6:00 p.m. the day before school resumes. In *odd* numbered years, from the last day of school at 6:00 p.m. until 6:00 p.m. the following Thursday.

e. <u>Mother's Day/Father's Day</u>:  The children shall spend every Mother's Day weekend from 6:00 p.m. on Friday until 6:00 p.m. on Sunday with Susana Moody.  The children shall spend every Father's Day weekend with Ross Moody.  This visitation period supersedes all other visitation periods.

In the event a holiday, not specified above, consists of a Monday, such as Martin Luther King Day, Memorial Day, Labor Day, etc., where the children are off from school, the parent having custody of the children for the weekend immediately preceding the holiday shall also have custody of the children through the holiday, and the children are to be returned to Ross Moody at 6:00 p.m. the day before school resumes.

In complying with the above and foregoing visitation schedules, the parties shall further be bound by the following provisions:

a.  After each "Holiday Visitation" period, the parties shall resume alternating weekends as though unaffected thereby.  For example, if Susana enjoys visitation with the children for the last full weekend preceding "Mardi Gras"

29

(defined *supra*), Ross shall be entitled to custody of the children for the first full weekend following "Mardi Gras."

b.     In exercising said visitation periods, the parties shall exchange the children at Buc-ee's in Wharton, TX.

Ross has the exclusive, unilateral authority to make all decisions concerning the health, education, and welfare of the children, limited *only* by the following:

a.     Either party may travel out of Louisiana (or Texas) with the children. However, the parent traveling out-of-state with the minor children shall provide the other parent with reasonable advance notice, e.g., email notice, of the destination of the travel, the name and location where the parent and children will be lodging, and a telephone number where the parent and children can be reached.

b.     The parties shall at all times keep each other advised of their current addresses (home and work) and telephone numbers (home, work, and cellular).

c.     When one party is exercising custody or visitation with the children, the other party shall have the right of reasonable access by telephone during reasonable hours.  One telephone call per day is generally considered reasonable. Both parents will be permitted to text and/or email the children during the other parent's custody or visitation.

d.     Neither party shall attempt or condone any attempt, whether directly or indirectly, by artifice or subterfuge to estrange the children from the other party or injure or impair the mutual love and affection by and between the children and either party hereto.

e.     Neither party shall make any negative or condescending remarks about the other party within the presence of or within the hearing of the children.  Both parties shall also take reasonable steps to prevent third parties from doing so.

f.     Neither party shall discuss the specific details of the legal proceedings herein with the children.

g.     Neither party shall disparage the activities or nature or essence of the time that the children spend with the other party.

h.     Each party shall have the right to access any and all school records, including the records of extracurricular school activities, from any school in which the children are enrolled; each party shall also have the right to access all medical, dental, and/or other health records of the children from any third-party healthcare provider.

i.     Ross shall keep Susana fully advised of any and all extracurricular activities in which the children are participating, to include providing Susana with a schedule of games, practices, and other important dates/events, to the extent that the extracurricular activities are not affiliated with the school in which the children are enrolled.

**Assignments of Error Two and Three:  Final periodic support**

Regarding the trial court's order of final periodic support, Ross first re-argues his exception of peremption and motion to dismiss due to abandonment. Alternatively, he asserts that the trial court erred in finding that Susana carried her burden in proving that she was entitled to final periodic support.  We will first address the peremption and abandonment issues raised in Ross's Assignment of Error Two.

Ross asserts that when Susana finally did pursue final periodic support again in 2017, the claim had been abandoned and could not be revived as it was now perempted by operation of law.

This court has stated that "[w]hether a party has taken a step in the prosecution of a case is a question of fact, subject to a manifest error standard of review. On the other hand, whether the act precludes abandonment is a question of law that is reviewed de novo." *Gravlee v. Gravlee*, 11-509, pp. 2–3 (La.App. 3 Cir. 12/7/11), 79 So.3d 1169, 1172 (citations omitted). We also note that La.Code Civ.P. art. 561 defining abandonment is to be "liberally construed in favor of maintaining a plaintiff's suit." *Id.* (citing *Clark v. State Farm Mut. Auto. Ins. Co.*, 00-3010, p. 8 (La. 5/15/01), 785 So.2d 779, 785).

As to peremption, "evidence may be introduced to support or controvert the exception. La. C.C.P. art. 931. In the absence of evidence, an exception of peremption must be decided upon the facts alleged in the petition with all of the allegations accepted as true." *Lomont v. Bennett*, 14-2483, p. 8 (La. 6/30/15), 172 So.3d 620, 627. However, "[i]f evidence is introduced at the hearing on the peremptory exception of peremption, the district court's findings of fact are reviewed under the manifest error-clearly wrong standard of review." *Id.*

The issue of peremption of Susana's final periodic support claim was previously denied by the trial court in open court on July 6, 2021, with judgment being signed on April 5, 2022, wherein the court stated, "ROSS MOODY'S Exception of Prescription or Alternatively, Exception of Preemption against SUSANA F. MOODY'S claim for Final Periodic Support is denied." Ross then took writs to this court, and this court denied the writ, as did the Louisiana Supreme Court. *Moody v. Moody*, 22-312.

Although Ross argues the law of the case doctrine should not apply in this circumstance as it is discretionary, we note that the doctrine does not apply to interlocutory rulings. *Durel v. Acadian Ear, Nose, Throat & Facial Plastic Surgery,*

*APMC*, 23-24 (La. 3/7/23), 356 So.3d 1010. Therefore, we will consider the abandonment and peremption arguments.

Louisiana Civil Code Article 117 sets forth the peremption period for claiming permanent periodic support:

> The right to claim after divorce the obligation of spousal support is subject to a peremption of three years. Peremption begins to run from the latest of the following events:
>
> (1) The day the judgment of divorce is signed.
>
> (2) The day a judgment terminating a previous judgment of spousal support is signed, if the previous judgment was signed in an action commenced either before the signing of the judgment of divorce or within three years thereafter.
>
> (3) The day of the last payment made, when the spousal support obligation is initially performed by voluntary payment within the periods described in Paragraph (1) or (2) and no more than three years has elapsed between payments.

In addition to prescription and peremption, civil claims are subject to abandonment. *See* La.Code Civ.P. art. 561. "Abandonment is both historically and theoretically a form of liberative prescription that exists independent from the prescription that governs the underlying substantive claim." *Olson v. City of Baton Rouge/Par. of E. Baton Rouge*, 18-1045, p. 8 (La.App. 1 Cir. 6/21/19), 280 So.3d 640, 646, *writ denied*, 19-1182 (La. 10/15/19), 280 So. 3d 598. The court in *Olson* further explained that the underlying policy behind abandonment "is the prevention of protracted litigation that is filed for purposes of harassment or without a serious intent to hasten the claim to judgment." *Id.* Abandonment is set forth in La.Code Civ.P. art. 561:

> A. (1) An action is abandoned when the parties fail to take any step in its prosecution or defense in the trial court for a period of three years . . .

33

. . . .

B. Any formal discovery as authorized by this Code and served on all parties whether or not filed of record, including the taking of a deposition with or without formal notice, shall be deemed to be a step in the prosecution or defense of an action. . . .

Ross cites *Nixon v. Nixon*, 20-694 (La.App. 1 Cir. 12/30/20), 319 So.3d 315, which is similar to the facts of the case before us. In *Nixon*, the wife sought spousal support in her petition for divorce filed January 5, 2015. She reasserted the claim in a motion filed May 4, 2015. Several motions for contempt regarding the husband's failure to make payments according to a protective order were also filed and ruled on in 2015, 2016, and 2017. Then, on August 19, 2019, the wife filed a Rule to Establish Final Support. The court considered the peremption and abandonment articles. Despite the wife timely asserting her claim for support in her petition for divorce, the appellate court found that "more than three years passed between the 2015 motion and 2019 rule without a step toward prosecution" of her permanent support claim. *Id*. at 319. The court then explained:

Louisiana Civil Code Article 3463 provides that an interruption of prescription resulting from a suit properly filed within the prescriptive period continues only as long as the suit is pending. "Interruption is considered never to have occurred if the plaintiff abandons, voluntarily dismisses the action at any time either before the defendant has made any appearance of record or thereafter, or fails to prosecute the suit at the trial." La. Civ. Code Art. 3463. In contrast to prescription, Louisiana Civil Code Article 3461 provides that peremption may not be renounced, interrupted, or suspended; however, the provisions on prescription governing computation of time apply to peremption. See La. Civ. Code Art. 3459. Confirming that abandonment has the same effect on peremption as on prescription, Revision Comment (c) to Article 3461 states, "[W]hen an action asserting a right subject to peremption has been commenced or served as provided in Article 3462, the right has been exercised and so long as the action is pending the lapse of the period of peremption does not extinguish the right." (Emphasis added.) *See also Stephens* [*v. Stephens*, 48,957 (La.App. 2 Cir. 4/9/14)],137 So.3d [1242] at 1245-46.

34

Jennifer's spousal support claim was abandoned; therefore, for purposes of peremption, the assertion of the claim is considered never to have occurred. *See Stephenss* [sic], 137 So.3d at 1246. Consequently, there was no exercise of the right and upon the expiration of the three-year peremptive period the right was extinguished.

Susana has made several claims for final periodic support, the first of which is found in her original Petition for Divorce. On March 14, 2011, a hearing officer awarded Susana $750.00 per month in interim spousal support. The Judgment of Divorce was entered on March 6, 2012. On May 12, 2012, Susana filed a Rule to Show Cause wherein she again sought final periodic support. Susana alleged that Ross was currently ordered to pay $750.00 per month, that the children had severe health and developmental issues, that Susana had not worked since 2002, and that due to the children's needs, she was not in a position to return to work. Thereafter, Susana sought a rule ordering Ross to show why he should not be ordered to provide "permanent spousal support, or alternatively a continuation of the interim spousal support until such time as she is able to return to the workforce." On June 25, 2012, a hearing officer recommended that the claim for final periodic support be deferred for trial. No motion for a hearing before the judge was filed, and the judge signed the Hearing Officer's Recommendations as a judgment on July 11, 2012.

On September 1, 2017, Susana filed a Motion and Order for Spousal Support. In that motion, she states:

A hearing officer conference was held on 3/14/2011 on the issue of spousal support where Ross Moody was ordered to pay $750.00 per month in spousal support. Another hearing was held on March 6, 2012 where Ross Moody was ordered to continue to pay Susana Moody $750.00 in spousal support. Then on June 25, 2017 this matter was deferred to trial. This matter has never been readdressed.

The hearing on the motion was continued several times. The spousal support claims were not addressed by the trial court until February 6, 2019, when the trial

court stated in open court, "we recognize that the spousal support, interim and permanent, is still out there." Thereafter, Susana filed a rule for spousal support and contempt on March 30, 2021, after which Ross filed his exception and motion for dismissal.

Ross asserts on appeal that since June 25, 2012, he made his last payment of interim spousal support on September 2, 2012, and that since this time Susana has abandoned her claim. We note that, clearly, Susana made a timely claim for final periodic support back in 2012, specifically she raised her claim within three years of the final divorce judgment. However, Ross asserts that, as in *Nixon*, when Susana finally did pursue final periodic support again in 2017, the claim had been abandoned and could not be revived as it was now perempted by operation of law.

In her original opposition to Ross's peremptory exception and abandonment motion, Susana alleges that the permanent support was not merely deferred "until trial" but specifically deferred until the community property partition trial. She alleges this is because Ross "intentionally lied to the court about his gross income" specifically regarding the ownership of the Ameritrade investment account, which at the time, he asserted was community property. However, in 2019, Susana alleges Ross claimed that property as his sole property. Although there is no attached evidence regarding this claim, similar claims were made in Susana's May 15, 2012, Rule to Show Cause seeking support and a recalculation of child support as Ross "did not reveal at that time his accurate income for 2011."

Specifically, the Hearing Officer's Recommendation dated June 25, 2012, and filed on July 12, 2012, states: "Parties agree to address investment income during the partition of community. Child support is to remain at $1,822.00 per month. ISS issue—Husbands Rule to Reduce—Wife seeking COBRA payments—Defer to

36

Trial—May be a permanent spousal support issue. Dad having to pay house note—That is to be credited to his ordered amount of ISS-as recommended by H.O." The recommendations were signed as a Judgment by the trial court on July 11, 2012.

In the reasons in open court for denying Ross's exception, the trial court stated it reviewed the record and noted the May 1, 2020 Written Reasons for Judgment, which provided reasons pertaining to a judgment on the community property partition. The court noted that "the community property partition began in September, 2017, along with the trial on the setting of child support. However, at some point in the trial, it was decided that the attorneys would stop presenting evidence on the partition issues and only focus on the child support issues." The partition issues "resumed on August 20, 2019, and finished on August 21, 2019." In the reasons for judgment, the trial court specifically addressed spousal support as follows: "Ross requests reimbursement of $12,098.00 for overpayment of spousal support in his detailed descriptive list. All parties agreed that Susana's request for spousal support has not been addressed yet as her need could be affected by the community property partition. All parties agreed to defer this issue." Finally, after all community property claims were resolved, the court stated, "The only remaining issues should be the determination of child support arrears and issues surrounding spousal support such as Susana's claim for spousal support, Ross'[s] claim for overpayment, etc."

In determining whether a suit is abandoned, we note:

The supreme court has uniformly held that La. C.C.P. art. 561 is to be liberally construed in favor of maintaining a plaintiff's suit. Because dismissal is the harshest of remedies, any reasonable doubt about abandonment should be resolved in favor of allowing the prosecution of the claim and against dismissal for abandonment. The intention of La. C.C.P. art. 561 is not to dismiss suits as abandoned

37

based on technicalities, but only those cases where plaintiff[']s inaction during the three-year period has clearly demonstrated his abandonment of the case. For the purpose of determining abandonment, the intent and substance of a party's actions matter far more than technical compliance.

*Moise v. Baton Rouge Gen. Med. Ctr.*, 22-623, pp. 6–7 (La.App. 1 Cir. 4/20/23), 367 So.3d 108, 113, *writ denied*, 23-718 (La. 9/26/23), __ So.3d __. In *Moise*, the first circuit held that an informal agreement to a stay in this medical malpractice case was a defense waiver of its abandonment claim, despite the traditional finding that informal agreements do not constitute a "step" in the prosecution. After reviewing evidence of the informal agreement, the court stated, "Unlike most informal negotiations and correspondence that does not interrupt the abandonment period, the informal agreement in this case had the laudable goal of handling the malpractice cases in both a professional and a cost-saving method to the clients." *Id*. at 115. The court continued, "we find that the letter of August 13, 2020, wherein the attorney for the defendants acknowledged the two lawsuits and the need to consolidate the cases, interrupted the abandonment period." *Id*. Unlike the wife in *Nixon*, Susana made several claims for final periodic support and the issue was deferred until trial. Thus, we reach a similar conclusion as *Moise* herein, and will consider whether Susana carried her burden of proving her claim for final periodic support.

*Final periodic support:*

Recently, our court has summarized:

Louisiana Civil Code Articles 111 and 112 provide for final periodic spousal support. Under these articles, a trial court must make three findings of fact before awarding this type of support. First, whether the claimant spouse is free from fault in the dissolution of the marriage. Second, whether the claimant spouse has a legal need for final periodic support. And third, whether the payor spouse has the ability to pay final periodic support.

38

*Tucker v. Tucker*, 22-23, pp. 2–3 (La.App. 3 Cir. 6/8/22), 344 So.3d 808, 812, *writ denied*, 22-1078 (La. 10/18/22), 348 So.3d 732.

These determinations are questions of fact, which require review on appeal pursuant to the manifest error standard. *Tucker*, 344 So.3d 808.

> In the area of domestic relations, much discretion must be vested in the trial judge and particularly in evaluating the weight of evidence which is to be resolved primarily on the basis of the credibility of witnesses. The trial judge having observed the demeanor of the witnesses is in the better position to rule on their credibility.

*Pearce v. Pearce*, 348 So.2d 75, 78 (La.1977). The burden of proof initially rests with the mover, in this case, Susana. *Id*.

In *Tucker*, 344 So.3d at 812, our court explained legal fault:

> In *Adams v. Adams*, 389 So.2d 381 (La.1980), the Louisiana Supreme Court explained that "fault" for purposes of barring alimony (now final periodic spousal support) is synonymous with the fault grounds for separation and divorce under La.Civ.Code arts. 138 and 139 (1870). The fault grounds of former Articles 138 and 139 consist of adultery; conviction of a felony and sentence to death or imprisonment with hard labor; habitual intemperance, excesses, cruel treatment, or outrages if such is of such a nature to render their living together insupportable; public defamation; abandonment; an attempt by one on the life of another; being charged with a felony and fleeing from justice; and intentional non-support.

*Adams* continued to explain "cruel treatment" by quoting *Pearce*, 348 So.2d at 77, as follows:

> We have held that, under this statute respecting an award of alimony to a wife without 'fault', the word 'fault' contemplates conduct or substantial acts of commission or omission by the wife violative of her marital duties and responsibilities. A wife is not deprived of alimony after divorce simply because she was not totally blameless in the marital discord. *Vicknair v. Vicknair*, 237 La. 1032, 112 So.2d 702 (1959); *Davieson v. Trapp*, 223 La. 776, 66 So.2d 804 (1953); *Breffeilh v. Breffeilh*, 221 La. 843, 60 So.2d 457 (1952); *Adler v. Adler*, 239 So.2d 494 (La.App. 4th Cir. 1970). To constitute fault, a wife's misconduct must not only be of a serious nature but must also be an independent

39

contributory or proximate cause of the separation. *Kendrick v. Kendrick*, 236 La. 34, 106 So.2d 707 (1958).

In open court, the trial court found that Susana was free from fault:

> With regard to spousal support, I've reviewed the record and the memos as submitted, and the filings, and pleadings. I do not find fault on Susan's [sic] part. By his own testimony, something as simple as getting the girls['] ears pierced caused a rift in the home. But also by Dr. Simoneaux's report, the anger, the failure to deal with issues at home as well as the constant playing of video games and not taking care of family needs, emotionally, and the possible allegations of abuse[.]

Dr. Simoneaux performed an evaluation of the parties in 2011 and prepared a report in January of 2012. This report focused largely on the problems in the marriage that led to divorce. Based on this report, the trial court could determine Susana was not at fault for the failure of the marriage. Susana did allege physical and emotional abuse, explaining also that Ross was overly critical of her throughout their marriage and "generally neglectful of the family's needs." Ross also admitted to several instances in which he was aggressive with Susana, but it is unclear whether it was before or after they split and later reconciled in 2005. However, Dr. Simoneaux's report indicates that Ross spent an extreme amount of time playing video games. Ross reported he would often spend eight hours playing games when he was not at work. Dr. Simoneaux stated, "By his own admission, it seems, he was playing videogames to an extreme degree, even in the midst of numerous family crises. He seemed to have trouble putting that aside and he retreated into that kind of escape when he was faced with stress." Thus, we find the trial court could determine, based on the record, that Susana was free from fault in the dissolution of the marriage.

Next, we consider the legal need for support. Louisiana Civil Code Article 112 states:

A. When a spouse has not been at fault prior to the filing of a petition for divorce and is in need of support, based on the needs of that party and the ability of the other party to pay, that spouse may be awarded final periodic support in accordance with Paragraph B of this Article.

B. The court shall consider all relevant factors in determining the amount and duration of final support, including:

(1) The income and means of the parties, including the liquidity of such means.

(2) The financial obligations of the parties, including any interim allowance or final child support obligation.

(3) The earning capacity of the parties.

(4) The effect of custody of children upon a party's earning capacity.

(5) The time necessary for the claimant to acquire appropriate education, training, or employment.

(6) The health and age of the parties.

(7) The duration of the marriage.

(8) The tax consequences to either or both parties.

(9) The existence, effect, and duration of any act of domestic abuse committed by the other spouse upon the claimant or a child of one of the spouses, regardless of whether the other spouse was prosecuted for the act of domestic violence.

C. When a spouse is awarded a judgment of divorce pursuant to Article 103(2), (3), (4), or (5), or when the court determines that a party or a child of one of the spouses was the victim of domestic abuse committed by the other party during the marriage, that spouse is presumed to be entitled to final periodic support.

D. The sum awarded under this Article shall not exceed one-third of the obligor's net income. Nevertheless, when support is awarded after a judgment of divorce is rendered pursuant to Article 103(4) or (5), or when the court determines that a party or a child of one of the spouses was the victim of domestic abuse committed by the other party during the marriage, the sum awarded may exceed one-third of the obligor's net income and may be awarded as a lump sum.

This court in *Tucker*, 344 So.3d at 817 explained that the jurisprudence has equated "in need of support" with "necessitous circumstances." *Tucker*, 344 So.3d at 817–818 (footnote omitted), further set forth the following examples in our jurisprudence:

"Means, in this context, has been defined as including not only the income but also the assets of the claimant spouse." *Id.* [*Fontana v. Fontana*, 13-916, p. 11 (La.App. 4 Cir. 2/12/14), 136 So.3d 173, 181.] "The claimant spouse has the burden of proving he or she has insufficient means of support or is in necessitous circumstances." *Id.* "Support," in this context, connotes an amount sufficient for the claimant spouse's maintenance, which includes expenses for food, shelter, clothing, reasonable and necessary transportation expenses, medical and drug expenses, and the income tax liability generated by the support payments. *Loyacano v. Loyacano*, 358 So.2d 304 (La.1978), *vacated on other grounds, sub nom. Loyacano v. LeBlanc*, 440 U.S. 952, 99 S.Ct. 1488, 59 L.Ed.2d 766 (1979), *reinstated*, 375 So.2d 1314 (La.1979).

Similarly, in *Bernhardt v. Bernhardt*, 283 So.2d 226, 229 (La.1973) (emphasis in original), the supreme court explained that "the term 'maintenance', while meaning *primarily* food, clothing and shelter, does include such items as reasonable and necessary transportation or automobile expenses, medical and drug expenses, utilities, household expenses, and the income tax liability generated by the alimony payments made to the former wife."

In summary, we hold that the "in need of support" language of La.Civ.Code arts. 111 and 112 equates to "necessitous circumstances." And "necessitous circumstances" is synonymous with insufficient means for "maintenance." Thus, final periodic support is awarded to a former spouse in need and is limited to an amount sufficient for maintenance as opposed to continuing an accustomed style of living. Maintenance includes expenses for food, shelter, clothing, reasonable and necessary transportation or automobile expenses, medical and drug expenses, utilities, household expenses, and the income tax liability generated by the payments of final periodic support to the former wife.

The trial court did not recite any factual findings demonstrating Susana was in need of support. However, the court did note that it considered "the record and the memos as submitted, and the filings, and pleadings." Susana testified throughout

42

the years that she was unable to work during the marriage, and then could not work after due to mental health issues that began after the 2014 custody hearing. Additionally, she is in child support arrears which are now garnished from her wages. However, we also note that Susana was permitted to use $65,000.00 of community funds for living expenses, Ross paid much of the mortgage on the home as well as child support, and, when the custody judgment was rendered in 2014, Ross paid Susana $20,000.00 to assist her in getting situated with a new living arrangement. Furthermore, Susana was able to procure employment. Considering the above and the lack of evidence otherwise introduced in the record, we find that Susana did not carry her burden in proving her entitlement to final periodic support. Furthermore, there was no specific testimony or evidence regarding Ross's ability to pay. Therefore, we reverse the trial court's ruling granting Susana final periodic support.

**Assignment of Error Four: Motion for Contempt**

Ross asserts that Susana has filed multiple contempt citations against him throughout the course of these proceedings. Ross asserts that the trial court violated his due process rights because it did not identify which court order Ross violated. Furthermore, Ross argues that Susana failed to meet her burden of proving the contempt violations. Lastly, Ross argues, that "the court made no finding whether the contempt was" direct or constructive contempt and "failed to strictly follow the procedures required by law and conduct a trial and afford the defendant his due process rights."

In reviewing a trial court's determination that a party should be held in contempt, we give great discretion to the trial court and only reverse "when the appellate court discerns an abuse of that discretion." *Couvillon v. Couvillon*, 23-56,

p. 21 (La.App. 1 Cir. 8/29/23) (unpublished opinion).  The *Couvillon* court further

explained:

> Contempt of court is any act or omission tending to obstruct or
> interfere with the orderly administration of justice, or to impair the
> dignity of the court or respect for its authority.  La. C.C.P art. 221.  A
> direct contempt is one committed in the immediate view and presence
> of the court and of which it has personal knowledge, or a contumacious
> failure to comply with a subpoena or summons.  La. C.C.P. art. 222.
> Any contempt other than a direct one constitutes a constructive
> contempt of court, including willful disobedience of any lawful
> judgment or order of the court.  La. C.C.P. art. 224(2).  A person may
> not be found guilty of a contempt of court except for misconduct
> defined as such, or made punishable as such, expressly by law. La.
> C.C.P. art. 227.
>
> According to La. C.C.P. art. 224(2), a person may be found in
> constructive contempt of court for willfully disobeying any "lawful
> judgment, order, mandate, writ, or process of the court."  A finding that
> a person willfully disobeyed a court order in violation of La. C.C.P. art.
> 224(2) must be based on a finding that the person violated an order of
> the court intentionally, knowingly, and purposefully, without justifiable
> excuse.  *Carollo v. Carollo*, 2013-0010 (La. App. 1 Cir. 5/31/13), 118
> So.3d 53, 64.  If the person charged with contempt is found guilty, La.
> C.C.P. art. 225(B) provides that the court shall render an order reciting
> the facts constituting the contempt, adjudging the person charged with
> contempt guilty thereof, and specifying the punishment imposed. See
> *Underwood v. Underwood*, 2021-0277 (La. App. 1 Cir. 10/21/21), 332
> So.3d 128, 153-54.

*Id*. at p. 20.

Furthermore, "[i]f the person charged with contempt is found guilty the court

shall render an order reciting the facts constituting the contempt, adjudging the

person charged with contempt guilty thereof, and specifying the punishment

imposed."  La.Code Civ.P. art. 225(B).  However, courts have found that the

recitation of these facts in open court, rather than in a written order, meets this

requirement.  *See Couvillon*, 23-56, and cases cited therein.[6]

---

[6] In *Couvillion*, the appellate court concluded that the trial court failed to provide the
necessary facts constituting contempt in either the written judgment or in open court.  However,
the appellate court then went on to determine the basis of the court's ruling "with the allegations

Ross relies on *Havener v. Havener*, 29,785 (La.App. 2 8/20/97), 700 So.2d 533, to support his argument that the trial court failed to follow the procedures set forth in the contempt articles. In fact, *Havener*, 700 So.2d at 538 (citations omitted), states: "The provisions of C.C.P. art. 225(B) are mandatory and must be strictly construed. The failure of a trial court to recite facts constituting contempt mandates a reversal of a judgment of contempt."

In the case before us, the judgment vaguely states: "IT IS FURTHER ORDERED, ADJUDGED AND DECREED that Ross Moody is found in contempt for violating the court's orders, the Court does not assess any attorney's fees or jail time." The trial transcript does not provide more clarity, as the trial court merely states, "I find Ross in contempt for violating my court's orders. Since there's no attorney involved, I can't assess attorney's fees. And I will not assess any jail time."

Not only does the trial court fail to recite any facts for finding Ross in contempt, but the trial court also does not state which court order he violated, nor does it address which rule for contempt filed by Susana is at issue. While the transcript does state at one point the "contempt that's before the Court filed June the 8th, 2022[,]" we note that Susana filed another Rule for Contempt and Sanctions on June 14, 2022, that had yet to be ruled on.[7] The transcript provides the following colloquy:

> THE COURT:
> Okay. So, she's getting into her rule for contempt, Counsel, that was filed June the 8th, which is a part of these proceedings today.

---

in the contempt motion as supported by the testimony and evidence at trial." *Id*. at p. 22. This is in contrast to the second circuit in *Havener*, 700 So.2d 533, wherein the appellate court vacated the finding of contempt when the trial court failed to recite the facts for the finding of contempt.

[7] The June 8, 2022 Rule for Contempt was e-filed on June 6, 2022, and uses this date in the record table of contents.

MR. GRANGER:

    Right, and we haven't heard the contempts, yeah.

. . . .

THE COURT:

    . . . So, you filed a Rule for Contempt on June the 8th, which was set for today also.

The trial court did express "concerns" that the girls receive texts from their stepmother and Ross during Susana's visitation and ordered Ross to pay the hotel bills for Susana's visitation but did not state that these "findings" violated a court order.

Considering the above, we reverse and vacate the trial court's finding of contempt on the part of Ross Moody.

**DECREE:**

For the foregoing reasons, we reverse and vacate the trial court's award of spousal support to Susana as well as the trial court's finding that Ross Moody is in contempt of court. We also reverse and vacate the trial court's change of custody; reinstating Ross Moody with sole custody, but permitting Susana Moody with reasonable visitation as follows:

**IT IS ORDERED, ADJUDGED AND DECREED** that sole custody of E.S.M., DOB 03/22/2009 and E.K.M., DOB 3/22/2009 is granted to Ross Moody.

**IT IS FURTHER ORDERED, ADJUDGED AND DECREED** that Ross Moody shall enroll the children in counseling immediately.

**IT IS FURTHER ORDERED, ADJUDGED AND DECREED** that Ross Moody shall immediately enroll the minor children in school.

**IT IS FURTHER ORDERED, ADJUDGED AND DECREED** that Susana Moody will have reasonable visitation with the minor children as follows:

46

1. **School Year Visitation Schedule:**

During the school year, Susana Moody shall have visitation with the children every other weekend from Friday at 6:00 p.m. to Sunday at 6:00 p.m.

2. **Summer Visitation Schedule**

This schedule replaces the School Year Visitation Schedule and begins the second Friday after the termination of school. During the summer months, visitation and physical custody of the children will be as follows:

- In *even* numbered years, Susana will have visitation with the children from 6:00 p.m. on the second Friday after the termination of school for two consecutive weeks until 6:00 p.m. on Friday, when Ross will then have physical custody of the children for two consecutive weeks. Then, Susana will have visitation from 6:00 p.m. on the first Friday in July for two consecutive weeks until 6:00 p.m. on Friday, after which Ross will have physical custody of the children for two consecutive weeks.

- In *odd* numbered years, Ross will have physical custody of the children from 6:00 p.m. on the second Friday after the termination of school for two consecutive weeks until 6:00 p.m. on Friday, when Susana will then have visitation for two consecutive weeks. Then, Ross will have physical custody from 6:00 p.m. on the first Friday in July for two consecutive weeks until 6:00 p.m. on Friday, after which Susana will have visitation with the children for two consecutive weeks.

- Susana shall also be granted the right to have visitation with the children the first weekend in August, prior to school resuming, from Friday at 6:00 p.m. until Sunday at 6:00 p.m.

**3.     Holiday Visitation Schedule**

The parents shall alternate the visitation and physical custody of the children for the following holiday periods:

a. <u>Thanksgiving</u>:          Susana's visitation with the children will be as follows for this holiday:  In *even* numbered years, 6:00 p.m. the day before Thanksgiving until school resumes.  In *odd* numbered years, from the last day of school at 6:00 p.m. until 6:00 p.m. the day before Thanksgiving.  This visitation supersedes all other visitation periods.

b. <u>Christmas/New Years</u>:          Susana's visitation with the children will be as follows for this holiday:  In *even* numbered years, from 6:00 p.m. December 21 until 6:00 p.m. December 24.  In *odd* numbered years, from 6:00 p.m. December 24 until 6:00 p.m. December 27.  This visitation supersedes all other visitation periods.

c. <u>Mardi Gras</u>:      Susana's visitation with the children will be as follows for this holiday:  In *even* numbered years, from 6:00 p.m. the Sunday before Mardi Gras until 6:00 p.m. the day before school resumes.  In *odd* numbered years, from the termination of school on the Friday before Mardi Gras at 6:00 p.m. until 6:00 p.m. on the following Sunday.

d. <u>Easter and Spring Break</u>:      Susana's visitation with the children will be as follows for this holiday:  In *even* numbered years, from 6:00 p.m. the Thursday after school terminates for this holiday until 6:00 p.m. the day before school resumes.  In *odd* numbered years, from the last day of school at 6:00 p.m. until 6:00 p.m. the following Thursday.

e. <u>Mother's Day/Father's Day</u>:          The children shall spend every Mother's Day weekend from 6:00 p.m. on Friday until 6:00 p.m. on Sunday with

48

Susana Moody. The children shall spend every Father's Day weekend with Ross Moody. This visitation period supersedes all other visitation periods.

In the event a holiday, not specified above, consists of a Monday, such as Martin Luther King Day, Memorial Day, Labor Day, etc., where the children are off from school, the parent having custody of the children for the weekend immediately preceding the holiday shall also have custody of the children through the holiday, and the children are to be returned to Ross Moody at 6:00 p.m. the day before school resumes.

**IT IS FURTHER ORDERED, ADJUGED AND DECREED** that in complying with the above and foregoing visitation schedules, the parties shall further be bound by the following provisions:

a. After each "Holiday Visitation" period, the parties shall resume alternating weekends as though unaffected thereby. For example, if Susana enjoys visitation with the children for the last full weekend preceding "Mardi Gras" (defined *supra*), Ross shall be entitled to custody of the children for the first full weekend following "Mardi Gras."

b. In exercising said visitation periods, the parties shall exchange the children at Buc-ee's in Wharton, TX.

**IT IS FURTHER ORDERED, ADJUDGED AND DECREED** that Ross has the exclusive, unilateral authority to make all decisions concerning the health, education, and welfare of the children, limited *only* by the following:

a. Either party may travel out of Louisiana (or Texas) with the children. However, the parent traveling out-of-state with the minor children shall provide the other parent with reasonable advance notice, e.g., email notice, of the destination of

49

the travel, the name and location where the parent and children will be lodging, and a telephone number where the parent and children can be reached.

b. The parties shall at all times keep each other advised of their current addresses (home and work) and telephone numbers (home, work, and cellular).

c. When one party is exercising custody or visitation with the children, the other party shall have the right of reasonable access by telephone during reasonable hours. One telephone call per day is generally considered reasonable. Both parents will be permitted to text and/or email the children during the other parent's custody or visitation.

d. Neither party shall attempt or condone any attempt, whether directly or indirectly, by artifice or subterfuge to estrange the children from the other party or injure or impair the mutual love and affection by and between the children and either party hereto.

e. Neither party shall make any negative or condescending remarks about the other party within the presence of or within the hearing of the children. Both parties shall also take reasonable steps to prevent third parties from doing so.

f. Neither party shall discuss the specific details of the legal proceedings herein with the children.

g. Neither party shall disparage the activities or nature or essence of the time that the children spend with the other party.

h. Each party shall have the right to access any and all school records, including the records of extracurricular school activities, from any school in which the children are enrolled; each party shall also have the right to access all medical, dental, and/or other health records of the children from any third-party healthcare provider.

50

i.       Ross shall keep Susana fully advised of any and all extracurricular activities in which the children are participating, to include providing Susana with a schedule of games, practices, and other important dates/events, to the extent that the extracurricular activities are not affiliated with the school in which the children are enrolled.

**LASTLY, IT IS ORDERED, ADJUDGED, AND DECREED** that this custody and visitation schedule shall begin during the 2023 Thanksgiving holiday. Considering it is an odd year, Susana will have visitation with the children from the last day of school at 6:00 p.m. until 6:00 p.m. the day before Thanksgiving. Thereafter, Ross will have custody of the children from 6:00 p.m. the day before Thanksgiving until school resumes. The custody and visitation schedule will then continue thereafter as ordered above.

The costs of this appeal are assessed equally between the parties.

**REVERSED AND RENDERED.**

This opinion is NOT DESIGNATED FOR PUBLICATION.
Uniform Rules—Courts of Appeal, Rule 2-16.3.

51